# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 17, 2008        Decided April 17, 2009

No. 07-1247

CENTER FOR BIOLOGICAL DIVERSITY,
PETITIONER

v.

UNITED STATES DEPARTMENT OF THE INTERIOR,
RESPONDENT

AMERICAN PETROLEUM INSTITUTE,
INTERVENOR

---

Consolidated with 07-1344

---

On Petitions for Review of an
Order of the Department of Interior

---

*William J. Snape III* argued the cause for petitioner Center for Biological Diversity. On the briefs were *Matthew Vespa*, *Andrea A. Treece*, *Miyoko Sakashita*, and *Brendan R. Cummings*.

*Peter H. Van Tuyn* argued the cause and filed the briefs for petitioners Native Village of Point Hope, et al. *James B. Dougherty* entered an appearance.

*Janis M. Searles* was on the brief for *amici curiae* Ocean Conservancy, et al. in support of petitioners.

*Deborah A. Sivas* was on the brief for *amici curiae* W. Michael Hanemann and Charles Kolstad in support of petitioners.

*Sambhav N. Sankar*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief was *Ryan D. Nelson*, Deputy Assistant Attorney General. *Katherine W. Hazard*, Attorney, entered an appearance.

*Steven J. Rosenbaum* argued the cause for intervenor. With him on the brief were *Theodore L. Garrett*, *Mark W. Mosier*, and *Erik G. Milito*.

Before: SENTELLE, *Chief Judge*, and GINSBURG and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

Concurring opinion filed by *Circuit Judge* ROGERS.

SENTELLE, *Chief Judge*: In August 2005, the United States Department of Interior (Interior) began the formal administrative process to expand leasing areas within the Outer Continental Shelf (OCS) for offshore oil and gas development between 2007 and 2012. This new five-year Leasing Program included an expansion of previous lease offerings in the Beaufort, Bering, and Chukchi Seas off the coast of Alaska. Petitioners filed independent petitions for review challenging the approval by the Secretary of the Interior (Secretary) of this Leasing Program on various grounds. Specifically, Petitioners argue that: (1) the Leasing Program violates both the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331-1356a, and the

National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-4370f, because Interior failed to take into consideration both the effects of climate change on OCS areas and the Leasing Program's effects on climate change (the climate change claims); (2) the Leasing Program also violates both OCSLA and NEPA because Interior approved the Program without conducting sufficient biological baseline research for the three Alaskan seas, and further failed to provide a research plan detailing how it would obtain this baseline data before the next stage of the Program; (3) Interior violated the Endangered Species Act of 1973 (ESA), 16 U.S.C. §§ 1531-1544, by failing to consult with either the U.S. Fish and Wildlife Service (Fish and Wildlife) or the National Marine Fisheries Service (NMFS) about potential harm to endangered species in the OCS planning areas before it adopted the Leasing Program; and (4) the Leasing Program violates OCSLA because it irrationally relied on an insufficient study by the National Oceanographic and Atmospheric Administration (the NOAA study) in assessing the environmental sensitivity of the OCS planning areas in the Leasing Program. We hold that Petitioners' NEPA-based climate change claim, Petitioners' NEPA baseline data claim, and Petitioners' ESA claim are not yet ripe for review. We therefore dismiss the petition with respect to these claims.

Nevertheless, we conclude that Petitioners' remaining OCSLA-based challenges are all justiciable. Of these three remaining claims, Petitioners' OCSLA-based climate change claims and their OCSLA-rooted baseline data challenge ultimately lack merit and must fail. However, we find meritorious Petitioners' challenge to the Leasing Program on grounds that the Program's environmental sensitivity rankings are irrational. Accordingly, we vacate the Leasing Program, and remand the Program to the Secretary for reconsideration in accordance with this opinion.

## I.  BACKGROUND

### A.  Introduction

The Outer Continental Shelf is an area of submerged lands, subsoil, and seabed that lies between the outer seaward reaches of a state's jurisdiction and that of the United States.  43 U.S.C. § 1331(a).  The OCS generally extends from 3 miles to 200 miles off the United States coast.  This action concerns a Leasing Program approved by Interior that includes a potential expansion of previous lease offerings in the Beaufort, Bering, and Chukchi Seas off the coast of Alaska.  Each of these seas is home to a number of species of wildlife.  For instance, the Beaufort and Chukchi Seas are home to two polar bear populations.  The North Pacific right whale, an endangered marine mammal, is known to inhabit the Bering Sea.  Bowhead whales are also known to feed and migrate through each of these seas.  In addition, a number of other species of whale, seals, the Pacific walrus, and various seabirds are indigenous to these seas.

Three petitioners—Center for Biological Diversity, Alaska Wilderness League, and Pacific Environment—are non-profit activist organizations whose members have been working to preserve and protect the waters and living environments off the coast of Alaska.  The remaining petitioner—the Native Village of Point Hope, Alaska—is a federally recognized tribal government whose members use the Chukchi Sea coast for subsistence hunting, fishing, whaling, and gathering, as well as cultural and religious activities.

### B.  Outer Continental Shelf Lands Act

OCSLA establishes a procedural framework under which Interior may lease areas of the OCS for purposes of exploring

and developing the oil and gas deposits of the OCS's submerged lands. *See* 43 U.S.C. §§ 1334, 1337; *see also California v. Watt*, (*Watt I*), 668 F.2d 1290, 1295-1300 (D.C. Cir. 1981). In order to ensure "the expeditious but orderly development of OCS resources," *Watt I*, 668 F.2d at 1297, OCSLA provides that Interior undertake a four-stage process in order to develop an offshore oil well. *See Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984). As we noted in *Watt I*, the leasing program's four-stage process is "pyramidic in structure, proceeding from broad-based planning to an increasingly narrower focus as actual development grows more imminent." *Watt I*, 668 F.2d at 1297. This multi-tiered approach was designed "to forestall premature litigation regarding adverse environmental effects that . . . will flow, if at all, only from the latter stages of OCS exploration and production." *Sec'y of Interior*, 464 U.S. at 341.

First, during the preparation stage, Interior creates a leasing program by preparing a five-year schedule of proposed lease sales. 43 U.S.C. § 1344. At this stage, "prospective lease purchasers acquire no rights to explore, produce, or develop" any of the areas listed in the leasing program. *Sec'y of Interior*, 464 U.S. at 338. Second, during the lease-sale stage, Interior solicits bids and issues leases for particular offshore leasing areas. 43 U.S.C. § 1337(a). Third, during the exploration stage, Interior reviews and determines whether to approve the lessees' more extensive exploration plans. 43 U.S.C. § 1340. Interior allows this exploration stage to proceed only if it finds that the lessees' exploration plan "will not be unduly harmful to aquatic life in the area, result in pollution, create hazardous or unsafe conditions, unreasonably interfere with other uses of the area, or disturb any site, structure, or object of historical or archeological significance." 43 U.S.C. § 1340(g)(3). Fourth and final is the development and production stage. During this stage, Interior and those affected state and local governments review an

6

additional and more detailed plan from the lessee. 43 U.S.C. § 1351. If Interior finds that the plan would "probably cause serious harm or damage . . . to the marine, coastal or human environments," then the plan, and consequently the leasing program, may be terminated. 43 U.S.C. § 1351(h)(1)(D)(i).

The Leasing Program at issue has only completed its first stage—preparation of the five-year program under Section 18 of OCSLA, 43 U.S.C. § 1344. Under Section 18, the Secretary is required to prepare, periodically revise, and maintain "an oil and gas leasing program" that consists of "a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity which he determines will best meet national energy needs for the five-year period following its approval or reapproval." 43 U.S.C. § 1344(a). The Secretary must prepare and maintain a leasing program consistent with several principles. First, the Secretary must ensure that a leasing program is "conducted in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the [OCS], and the potential impact of oil and gas exploration on other resource values of the [OCS] and the marine, coastal, and human environments." 43 U.S.C. § 1344(a)(1). Second, the Secretary must consider additional factors with respect to the timing and location of exploration, development, and production of oil and gas in particular OCS areas. These factors include, *inter alia*: a region's "existing information concerning the geographical, geological, and ecological characteristics"; "an equitable sharing of developmental benefits and environmental risks among the various regions"; "the interest of potential oil and gas producers in the development of oil and gas resources"; "the relative environmental sensitivity and marine productivity of different areas of the [OCS]"; and "relevant environmental and predictive information for different areas of the [OCS]." 43 U.S.C. §§ 1344(a)(2)(A), (B), (E), (G), (H). Next, Interior must ensure,

"to the maximum extent practicable," that the timing and location of leasing occurs so as to "obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone." 43 U.S.C. § 1344(a)(3). Finally Interior's leasing activities must ensure that winning lessees receive "fair market value for the lands leased and the rights conveyed by the Federal Government." 43 U.S.C. § 1344(a)(4).

Other provisions of OCSLA that are relevant to the leasing process are Sections 18(b) and 20. *See* 43 U.S.C. §§ 1344(b), 1346. Section 18(b) of OCSLA calls for Interior to include estimates of the appropriations and staff required to conduct and prepare the leasing program, including appropriations and staff estimates needed to conduct environmental studies and prepare an Environmental Impact Statement (EIS). 43 U.S.C. § 1344(b)(3). Section 20 of OCSLA also provides that, subsequent to a first lease in a given area, the Secretary "shall conduct such additional studies to establish environmental information as he deems necessary and shall monitor the human, marine, and coastal environments of such area or region in a manner designed to provide time-series and data trend information." 43 U.S.C. § 1346(b).

C. National Environmental Policy Act

NEPA's requirements are essentially "procedural in character," and are designed to "ensure solicitude for the environment through formal controls and thereby help realize the substantive goal of environmental protection." *North Slope Borough v. Andrus*, 642 F.2d 589, 598 (D.C. Cir. 1980). Ultimately, NEPA ensures that an agency's approval of a project is "a fully informed and well-considered decision." *Id.* at 599 (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Def. Council, Inc.*, 435 U.S. 519, 558 (1978)). To

that end, the statute requires that each agency "assess the environmental consequences of 'major [f]ederal actions' by following certain procedures during the decision-making process." *Nevada v. Dep't of Energy*, 457 F.3d 78, 87 (D.C. Cir. 2006) (quoting 42 U.S.C. § 4332(2)(C)). Before an agency may approve a particular project, it must prepare a "detailed statement . . . [on, *inter alia*,] the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action." 42 U.S.C. §§ 4332(2)(C)(i)-(iii). When faced with a multi-stage, pyramidic program such as the Leasing Program at issue here, NEPA's regulations allow an agency to conduct a tiered approach to preparing an EIS. *See* 40 C.F.R. § 1508.28; *see also Nevada*, 457 F.3d at 91 & n.9. Under this approach, an agency may issue a broader EIS at the earlier "need and site selection" stage of a program, and issue subsequent, more detailed environmental impact statements at the program's later, more site-specific stage. *See* 40 C.F.R. § 1508.28.

D.   Endangered Species Act

The ESA is designed to ensure that endangered species are protected from government action. Under the ESA, each federal agency is required to ensure that any action undertaken by the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical animal habitats. 16 U.S.C. § 1536(a)(2). If an agency concludes that its action "may affect" a listed species or critical habitat, then the agency must pursue either formal or informal consultation with the NMFS or Fish and Wildlife. *See* 50 C.F.R. §§ 402.13, 402.14. If the agency determines that its action will not affect any listed species or critical habitat, however, then it is not required to consult with NMFS or Fish and Wildlife. *See Southwest Center*

*for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447 (9th Cir. 1996).

E.   Leasing Program

The Five-Year Leasing Program in this case was first developed on August 24, 2005.  70 Fed. Reg. 49,669.  After developing and publishing a draft proposed plan, *see* 71 Fed. Reg. 7064 (Feb. 10, 2006), and reviewing commentary to that draft plan, Interior published a "Proposed Plan" and an accompanying draft EIS.   Finally, Interior published its "Proposed Final Plan" in April 2007 along with its Final EIS for the approval stage of the Leasing Program.  This was submitted to Congress and the President, and was later approved by the Secretary of Interior.   In total, the Leasing Program has scheduled 21 potential lease-sales between July 1, 2007 and June 30, 2012 in eight areas of the OCS.  Four of those potential leasing areas are in the Beaufort, Bering, and Chukchi Seas off the Alaska coast.   At the time the petitions challenging the approval of the Leasing Program were brought before this court, Interior had not yet conducted any lease-sales in these regions. Since that time, however, Interior has approved one lease-sale in the disputed Alaskan sea areas, Chukchi Sea Lease-Sale 193, which occurred on February 6, 2008.  Petitioner Point Hope and others challenged this lease-sale in the federal district court for the District of Alaska.

## II.  JURISDICTION

The federal judiciary's role is limited to resolving cases and controversies.  U.S. Const. art. III, § 2; *see also Allen v. Wright*, 468 U.S. 737, 750 (1984).  Accordingly, "before we reach the merits of any claim, we must first assure ourselves that the dispute lies within the constitutional and prudential boundaries of our jurisdiction."  *Util. Air Regulatory Group v. EPA*, 320

F.3d 272, 277 (D.C. Cir. 2003) (quoting *La. Envtl. Action Network v. Browner*, 87 F.3d 1379, 1382 (D.C. Cir. 1996)). Additionally, we must avoid "premature adjudication . . . and also . . . protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). We therefore must determine whether Petitioners have standing to bring their claims. We must also ensure that Petitioners' claims are ripe for review. For the following reasons, we hold that Petitioners' three OCSLA-based claims are justiciable. We also hold that Petitioners' NEPA-based climate change and baseline data challenges, and their ESA claim are not yet ripe for review.

A.   Climate Change Claims

Petitioners claim that Interior violated both OCSLA and NEPA because Interior failed to consider both the economic and environmental costs of the greenhouse gas emissions associated with the Program and the effects of climate change on OCS areas. In support of their claims, Petitioners advance two different theories of standing. We address each in turn. We hold that Petitioners lack standing on their substantive climate change theory. We hold, however, that Petitioners have standing to bring their climate change claims under their procedural theory of standing.

1.   Petitioners' Substantive Theory of Standing

Under their substantive theory of standing, Petitioners argue that Interior's approval of the Program brings about climate change, which in turn adversely affects the species and ecosystems of those OCS areas, thereby threatening Petitioners' enjoyment of the OCS areas and their inhabitants. In other words, Petitioners contend that, absent Interior's approval of the

Program, the OCS areas at issue would not be subject to environmental impacts allegedly brought about by climate change associated with the burning of fossil fuels produced under the Program.

To begin with, the Supreme Court's recent decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007), does not govern this issue. Its holding turned on the unique circumstances of that case, which are not present here. In *Massachusetts*, a group of private organizations petitioned the Environmental Protection Agency (EPA) to begin regulating emissions of four greenhouse gases, arguing that a rise in global temperatures and climatological changes resulted from an increase in the atmospheric concentration of greenhouse gases. After the EPA denied the petition, the petitioners—joined by the Commonwealth of Massachusetts—sought this Court's review of the EPA's denial of their petition. The EPA maintained that the petitioners lacked standing to bring such a petition because the harm that they alleged—the effect of greenhouse gas emissions on global warming—was widespread, and did not individually affect any of the petitioners. Accordingly, the EPA contended, petitioners failed to demonstrate a concrete and particularized injury required to show standing under Article III. After we upheld the EPA's denial of the petition without reaching a consensus on the standing issue, the Supreme Court decided on review that the petitioners had standing to bring their petition.

In its opinion, however, the Supreme Court made an effort to note that its finding was based on the uniqueness of the case before it. As the Court explained, it was "of considerable relevance that the party seeking review . . . is a sovereign State and not, as it was in *Lujan v. Defenders of Wildlife*, 504 U.S. 55 (1992), a private individual." *Massachusetts*, 549 U.S. at 518. The Court noted further that it was critical that Massachusetts

sought to assert its own rights as a state under the Clean Air Act, and was not seeking to protect the rights of its citizens under the Clean Air Act. *Id.* at 520 n.17. In light of these unique circumstances, the Court afforded Massachusetts "special solicitude" in the Court's standing analysis due to Massachusetts's interests in ensuring the protection of the land and air within its domain, and its "well-founded desire to preserve its sovereign territory." *Id.* at 519, 520. With respect to Massachusetts's injury, the Court found that Massachusetts "owns a substantial portion of the state's coastal property" that had already been harmed by the EPA's inaction, and that the EPA's failure to regulate these gases would cause additional harm to its shoreline. *Id.* at 523. Though the Court found that the risks of climate change were widely shared because *global* sea levels had already begun to rise, it nevertheless concluded that Massachusetts had shown a sufficiently particularized injury because Massachusetts had alleged that its particular shoreline had actually been diminished by the effects of climate change. *Id.* In other words, by showing that climate change had diminished part of its own shoreline, Massachusetts itself had shown that it had been affected "in a personal and individual way" by the EPA's failure to regulate greenhouse gases. *Defenders of Wildlife*, 504 U.S. at 560 n.1. Thus, *Massachusetts* stands only for the limited proposition that, where a harm is widely shared, a sovereign, suing in its individual interest, has standing to sue where that sovereign's individual interests are harmed, wholly apart from the alleged general harm.

Assuming *arguendo* that Point Hope is a sovereign that might be entitled to "special solicitude" under *Massachusetts*, it is clear that *Massachusetts* does not govern this case. Point Hope does not allege anywhere that it has suffered its own individual harm apart from the general harm caused by climate change, and its derivative effects on Point Hope's members. Point Hope does not allege that Interior's acts will cause damage

to, or otherwise adversely affect, any of its own territory. To the contrary, each of Petitioners' climate change claims are founded on Interior's Leasing Program actions and the effects of those actions on the climate in general. Moreover, to the extent that Petitioners allege that the Leasing Program caused any *actual* harm to any territory, this harm is limited to areas of the OCS—areas that are owned by the federal government, not by a state or Native American tribe. Aside from these allegations of generalized harm brought about by climate change, Petitioners have not demonstrated that climate change would directly cause any diminution of Point Hope's territory any more than anywhere else. Accordingly, without this necessary element being present, we find that *Massachusetts*'s limited holding does not extend to the standing analysis in this case.

Moreover, it is doubtful that Point Hope would be able to assert a quasi-sovereign claim on behalf of its members against the federal government, as Massachusetts had against the EPA. Both the majority and dissenting opinions in *Massachusetts* recognized the general rule that a sovereign is prohibited from bringing an action to protect its citizens from the operation of federal statutes. *See Massachusetts*, 549 U.S. at 520 n.17 (majority opinion); *id.* at 539 (Roberts, C.J., dissenting); *see also Massachusetts v. Mellon*, 262 U.S. 447, 484-86 (1923). Here, Point Hope does not allege any specific harm that it has suffered individually as a result of Interior's actions in approving the Leasing Program. Instead, Point Hope is suing on behalf of its members and their individual interests. As the Court has long recognized, only the United States, and not the states, may represent its citizens and ensure their protection under federal law in federal matters. *See Mellon*, 262 U.S. at 485-86.

Outside of the very limited factual setting of *Massachusetts*, the Supreme Court's decision in *Defenders of Wildlife* sets forth the test for standing. *See Fla. Audubon Soc'y v. Bentsen*, 94

F.3d 658 (D.C. Cir. 1996). In order for a petitioner to establish standing, a petitioner must demonstrate that it has suffered a concrete and particularized injury that is caused by, or fairly traceable to, the act challenged in the litigation and redressable by the court. *Defenders of Wildlife*, 504 U.S. at 560-61; *Fla. Audubon Soc'y*, 94 F.3d at 663. In cases such as this, where the petitioner is not the object of an alleged government action or inaction, "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Defenders of Wildlife*, 504 U.S. at 562 (quoting *Allen*, 468 U.S. at 758). In cases such as this, causation and redressability ordinarily hinge on the actions of "independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Defenders of Wildlife*, 504 U.S. at 562 (quoting *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (opinion of Kennedy, J.)). Accordingly, the petitioner bears the burden of "adduc[ing] facts showing that those [third-party] choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Defenders of Wildlife*, 504 U.S. at 562 (citing *Warth v. Seldin*, 422 U.S. 490, 505 (1975)).

Petitioners' substantive theory of standing fails because Petitioners have not established either the injury or causation element of standing. First, it is well-established that a party must demonstrate that it has suffered an injury that affects it in a "personal and individual way." *Defenders of Wildlife*, 504 U.S. at 560 n.1. Standing analysis does not examine whether the environment in general has suffered an injury. *See Fla. Audubon Soc'y*, 94 F.3d at 665. And yet Petitioners' substantive argument focuses on just this type of injury: that climate change might occur in the Arctic environment if the Leasing Program is allowed to proceed. This type of injury is insufficient to establish standing for two reasons. First, Petitioners' alleged injury runs afoul of the requirement that a justiciable injury must

be "actual or imminent, not conjectural or hypothetical." *Defenders of Wildlife*, 504 U.S. at 560 (internal quotation marks omitted). "A threatened injury must be certainly impending to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (internal quotation marks omitted). Petitioners can only aver that any significant adverse effects of climate change "may" occur at some point in the future. This does not amount to the actual, imminent, or "certainly impending" injury required to establish standing. Second, climate change is a harm that is shared by humanity at large, and the redress that Petitioners seek—to prevent an increase in global temperature—is not focused any more on these petitioners than it is on the remainder of the world's population. Therefore Petitioners' alleged injury is too generalized to establish standing.

Even if Petitioners were able to demonstrate an injury sufficient for standing, their substantive theory would still fail because Petitioners have failed to demonstrate a causal link between the government action by Interior and Petitioners' particularized injury. To properly establish causation, the injury must be "'fairly' traceable to the challenged action." *Allen*, 468 U.S. at 751. That is, the plaintiff must show that "it is substantially probable . . . that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff." *Fla. Audubon Soc'y*, 94 F.3d at 663 (citing *Allen*, 468 U.S. at 753 n.19). The more attenuated or indirect the chain of causation between the government's conduct and the plaintiff's injury, the less likely the plaintiff will be able to establish a causal link sufficient for standing. *See Allen*, 468 U.S. at 757-58.

In this case, Petitioners rely on too tenuous a causal link between their allegations of climate change and Interior's action in the first stage of this Leasing Program. In order to reach the conclusion that Petitioners are injured because of Interior's

alleged failure to consider the effects of climate change with respect to the Leasing Program, Petitioners must argue that: adoption of the Leasing Program will bring about drilling; drilling, in turn, will bring about more oil; this oil will be consumed; the consumption of this oil will result in additional carbon dioxide being dispersed into the air; this carbon dioxide will consequently cause climate change; this climate change will adversely affect the animals and their habitat; therefore Petitioners are injured by the adverse effects on the animals they enjoy.   Such a causal chain cannot adequately establish causation because Petitioners rely on the speculation that various different groups of actors not present in this case—namely, oil companies, individuals using oil in their cars, cars actually dispersing carbon dioxide—might act in a certain way in the future.   Moreover, Petitioners' causal chain fails to take into account that, at each successive stage of the Leasing Program, the law requires that Interior conduct additional and more detailed assessments of the Program's potential effect on the proposed leasing areas.   *See* 43 U.S.C. §§ 1340(g)(3), 1351(h)(1)(D)(i).   As mentioned previously, these additional analyses could scuttle a leasing program if the environmental effects of that program are found to be excessive.   *See supra* Section I.B.   Petitioners therefore also do not have standing because they cannot adequately establish causation. Accordingly, Petitioners' substantive theory of standing fails.

## 2.   Petitioners' Procedural Theory of Standing

Alternatively, Petitioners argue that they are injured by Interior's failure to comply with both OCSLA and NEPA requirements.   Specifically, Petitioners claim that Interior violated both OCSLA and NEPA because Interior failed to consider both the economic costs of the greenhouse gas emissions associated with the Program and the effects of climate change on OCS areas.   As the Supreme Court noted in

*Defenders of Wildlife*, a plaintiff may have standing if it can show that an agency failed to abide by a procedural requirement that was "designed to protect some threatened concrete interest" of the plaintiff. *Defenders of Wildlife*, 504 U.S. at 573 n.8. In such cases, the omission of a procedural requirement does not, by itself, give a party standing to sue. *Fla. Audubon Soc'y*, 94 F.3d at 664. Rather, "a procedural-rights plaintiff must show not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." *Id.* at 664-65. A plaintiff "must show that he is not simply injured as is everyone else, lest the injury be too general for court action, and suited instead for political redress." *Id.* at 667 n.4.

Petitioners may bring both their OCSLA- and NEPA-based climate change claims under their procedural standing theory. Petitioners have shown that they possess a threatened particularized interest, namely their enjoyment of the indigenous animals of the Alaskan areas listed in the Leasing Program. The Supreme Court has noted that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Defenders of Wildlife*, 504 U.S. at 562-63. This interest, however, will not suffice on its own "without any description of concrete plans, or indeed even any specification of *when*" the plaintiff will be deprived of the opportunity to observe the potentially harmed species. *Id.* at 564. Petitioners' affidavits demonstrate a sufficiently immediate and definite interest in enjoyment of the animals. Petitioners' members have detailed in their affidavits definitive dates in the near future. Second, Petitioners have shown, solely for the sake of an Article III standing analysis, that Interior's adoption of an irrationally based Leasing Program could cause a substantial increase in the risk to their enjoyment of the animals affected by the offshore drilling, and that our

setting aside and remanding of the Leasing Program would redress their harm.

### B.   NEPA Climate Change and Baseline Data Claims

We next consider the justiciability of Petitioners' climate change and baseline data claims under NEPA.  Petitioners contend that Interior failed to account for (1) the present and future impact of climate change on the Program areas, and (2) the impact on climate change of the additional consumption caused by the Program.  They also contend that Interior has effectively conceded that there is insufficient data detailing the baseline biological condition of the Beaufort, Bering, and Chukchi Seas in the Leasing Program because Interior has admitted that there are gaps in the baseline research for these areas.  Petitioners argue that Interior cannot adequately describe the affected areas, as required by 40 C.F.R. § 1502.15, until it conducts additional research to close these gaps, and completely establish the baseline conditions.  Interior's failure to conduct this research to close the baseline data gaps therefore violates NEPA.  In addition, Petitioners contend that Interior has violated 40 C.F.R. § 1502.22 because Interior has not disclosed to what extent this baseline information is either unavailable or absent, and has failed to provide this information, which is required to assess the environmental condition of 40 C.F.R. § 1502.15.

Here, Petitioners' NEPA-based claims are not ripe due to the multiple stage nature of the Leasing Program.  This court's decision in *Wyoming Outdoor Council v. United States Forest Service*, 165 F.3d 43 (D.C. Cir. 1999), is instructive here.   In *Wyoming Outdoor Council*, the court was faced with a NEPA challenge to a multi-stage on-shore leasing program similar to the Leasing Program at hand.  The *Wyoming Outdoor Council* petitioners argued that the Forest Service violated NEPA because it approved an oil-and-gas leasing program without first

determining whether an adequate site-specific environmental review had been performed.  As here, the petitioners' challenge in *Wyoming Outdoor Council* was brought at the early stage of the program that involved only "the identification and mapping of areas that might be suitable for leasing." *Id.* at 45.  The court dismissed the petitioners' NEPA challenge as unripe, finding that an agency's NEPA obligations mature only once it reaches a "critical stage of a decision which will result in 'irreversible and irretrievable commitments of resources' to an action that will affect the environment." *Id.* at 49 (quoting *Mobil Oil Corp. v. FTC*, 562 F.2d 170, 173 (2d Cir. 1977)).   In the context of multiple-stage leasing programs, we ultimately held that "the point of irreversible and irretrievable commitment of resources and the concomitant obligation to fully comply with NEPA do not mature until leases are issued." *Wyoming Outdoor Council*, 165 F.3d at 49.

Applying this reasoning here, Petitioners' NEPA challenges are not ripe for review.  At the point that Petitioners filed their petitions, Interior had only approved the Leasing Program at issue.  No lease-sales had yet occurred.  The Leasing Program here had therefore not yet reached that "critical stage" where an "irreversible and irretrievable commitment of resources" has occurred that will adversely affect the environment. *See id.*

Additionally, any harm that might befall Petitioners by having to wait until the actual leasing stage to bring their claims is outweighed by the harm to Interior (and other agencies).  Allowing a petitioner to bring such NEPA challenges to a leasing program when no rights have yet been implicated, or actions taken, would essentially create an additional procedural requirement for all agencies adopting any segmented program.  This would impose too onerous an obligation, and would require an agency to divert too many of its resources at too early a stage in the decision-making process.  By contrast, Petitioners suffer

little by having to wait until the leasing stage has commenced in order to receive the information it requires. In the meantime, as Interior points out, no drilling will have occurred, and consequently, no harm will yet have occurred to the animals or their environment.[1]

Petitioners argue, however, that the Supreme Court's decision in *Ohio Forestry Association, Inc. v. Sierra Club*, 523 U.S. 726 (1998), forestalls a conclusion that their NEPA challenges are not ripe. Specifically, Petitioners point to the Court's statement that "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can

---

[1]Petitioners claim that Interior's adoption of the Program could result in further exploration and seismic testing by third parties in the Program areas. Petitioners fail to point to any evidence that the Program itself authorizes anyone to conduct seismic testing or engage in any other activity detrimental to wildlife in the Program areas. Nor does anything in the record suggest that seismic testing or other exploration activities have been or will be conducted without being separately authorized by the Secretary of Interior. *Cf.* 30 C.F.R. § 251.4 (requiring permit for geological and geophysical exploration, including seismic testing and test drilling, of the OCS); Mineral Mgmt Svc., Dep't of the Interior, Recent G & G Permit Applications, Alaska OCS Region, http://www.mms.gov/alaska/re/recentgg/recentgg.htm (last visited Mar. 30, 2009). Moreover, the fact that Interior conducted one lease-sale in the Chukchi Sea since the time these petitions for review were filed does not make either Petitioners' NEPA claims or its ESA claim more ripe because Interior apparently undertook the additional requisite steps under NEPA and ESA prior to conducting that one lease-sale. *See* Chukchi Sea Planning Area Oil and Gas Lease Sale 193 and Seismic Surveying Activities in the Chukchi Sea, 72 Fed. Reg. 32,860 (June 14, 2007) (notice of availability of a Final Environmental Impact Statement). Point Hope and others have challenged the validity of this lease-sale in federal court in Alaska, and it is not at issue here.

never get riper." *Id.* at 737.  Accordingly, Petitioners argue that their NEPA claims are justiciable because, as the Court noted, they cannot get any riper.

*Ohio Forestry* does not control.  First, the case concerned a claim that the Forest Service had violated the National Forest Management Act of 1976 (NFMA), and whether that claim was ripe for review.  The quotation Petitioners rely on was therefore dicta.  *See id.* at 737.  True, considered dicta of the Supreme Court has long been regarded as forceful, even though it is not binding.  *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821).  Nevertheless, in *Ohio Forestry*, the Court did not opine that the obligation to conduct research under NEPA begins the moment an OCSLA Leasing Program is adopted, as Petitioners suggest.  *Ohio Forestry*, 523 U.S. at 737.  To the contrary, the Supreme Court did not address when the obligation to provide research under NEPA began.  *Id.*  The Court noted only that NEPA claims do not get any riper than they are at the moment a violation occurred.  *Id.*  It was not resolving the point at which such a violation would occur.  *Id. Wyoming Outdoor Council*, by contrast, fills in this gap by stating that a NEPA obligation commences once the agency reaches a "critical stage of a decision"—specifically, the leasing stage.  *Wyoming Outdoor Council*, 165 F.3d at 49.  It stands to reason that, applying *Ohio Forestry*, Petitioners' NEPA claims would not get any riper than at the time NEPA's obligation commenced and was disregarded.  That obligation has not yet occurred because Interior has only reached the Leasing Program issuance stage, and has not yet begun the leasing stage.  Accordingly, *Ohio Forestry* does not alter our analysis.

For these reasons, Petitioners' NEPA claims are not ripe.

C.  ESA Claim

When it approved the Leasing Program, Interior stated that it did not need to engage in any consultation concerning the Program's impacts on threatened and endangered species at this preliminary stage of the Program.  Instead, Interior indicated that it would comply with the ESA's Section 7 requirements once the Program reached its later stages.  *See* 16 U.S.C. § 1536.  Petitioners argue that Interior's failure to conduct such a consultation at the approval stage of the Leasing Program violates 16 U.S.C. § 1536(a)(2).   Interior counters that Petitioners' Section 7 claim is unripe.

Section 7 of the ESA clearly sets forth that:

> Each Federal agency shall, in consultation with [either the Fisheries Service or the Fish and Wildlife Services], insure that any action authorized, funded, or carried out by such agency . . .  is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical.

16 U.S.C. § 1536(a)(2).  Accordingly, an agency must consult with NMFS or Fish and Wildlife if the agency concludes that its action "may affect" a listed species or critical habitat.  *See* 50 C.F.R. §§ 402.13, 402.14.

In order to resolve the ripeness of Petitioners' ESA claim, our inquiry must therefore focus on whether an agency's approval of a leasing program "may affect" a listed species or critical habitat.   Petitioners argue that we should consider the Leasing Program's potential effect on endangered species as a whole in resolving this issue.   In other words, Petitioners

advocate a "but for" approach: if, because of events traceable to the agency's adoption of the multiple-stage leasing plan, it is possible that an endangered species will be affected, then the agency must consult with NMFS or Fish and Wildlife. Interior advocates more of a "proximate cause" approach, viewing each stage of the agency action as a separate intervening act, and linking any effect on endangered species to that particular stage.

Our holding in *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980), best informs the resolution of this issue. In *North Slope*, representatives of environmental organizations and native Alaskans sought to enjoin Interior from carrying out a leasing program for oil and gas development in the Beaufort Sea. Importantly, the leasing program in *North Slope* had already reached the lease-sale stage; the program had been approved by the Secretary, but no bids had been accepted, and no leases had been executed. *Id.* at 593-94. Nevertheless, as in this case, the *North Slope* petitioners argued that Interior's failure to consult with NMFS and Fish and Wildlife violated Section 7 of the ESA. Assuming without deciding that a lease sale and all subsequent program activities constituted "agency action" under the ESA, we held that "satisfaction of the ESA mandate that no endangered life be jeopardized must be measured in view of the full contingent of OCSLA checks and balances and all mitigating measures adopted in pursuance thereof." *North Slope*, 642 F.2d at 609. The segmented nature of OCSLA Leasing Programs is such a mitigating measure because it allows "graduated compliance with environmental and endangered life standards, [thereby making] ESA requirements more likely to be satisfied both in an ultimate and a proximate sense." *Id.* In other words, courts must consider the ESA's requirements in light of each particular leasing program stage at issue because those stages are there by design.

Applying the reasoning in *North Slope* to the facts before us, we conclude that Petitioners' ESA claim is not yet ripe. Given the multi-stage nature of leasing programs under OCSLA, we must consider any environmental effects of a leasing program on a stage-by-stage basis, and correspondingly evaluate ESA's obligations with respect to each particular stage of the program. Regardless of whether there has been an agency action under the ESA, the completion of the first stage of a leasing program does not cause any harm to anything because it does not require any action or infringe on the welfare of animals. The welfare of animals is, by design, only implicated at later stages of the program, each of which requires ESA consultation and additional environmental review by Interior. *See id.* at 608-09. In addition, at this initial stage, leasing programs may list areas that Interior does not intend to lease. It is therefore not certain, at least at this initial stage of the Leasing Program, that any of the endangered species in the areas at issue may be affected by the Program, as the proposed leases in these areas might never come to pass. As a result, both this court and the Secretary of the Interior "would benefit from postponing review until the policy in question has sufficiently 'crystallized' by taking on a more definite form." *Venetian Casino Resort, LLC v. EEOC*, 409 F.3d 359, 364 (D.C. Cir. 2005) (citing *City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1430-31 (D.C. Cir.1994)). Any hardship to Petitioners from delaying review of their ESA claim until after Interior moves beyond this initial stage of the Leasing Program is insufficient to outweigh the institutional interests of the court and Interior.[2] Petitioners' ESA challenge at this initial stage of the Leasing Program is therefore premature. *See Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284-85 (D.C. Cir. 2003).

---

[2]*See* note 1, *supra*.

D.   OCSLA-based NOAA Study and Baseline Information Claims

Finally, we conclude that we do have jurisdiction over both of Petitioners' remaining OCSLA-based claims.  Specifically, Petitioners argue that the Leasing Program violates OCSLA because Interior approved the Program without conducting sufficient biological baseline research.  Petitioners also contend that the Leasing Program violates Section 18(a)(2)(G) of OCSLA because it relied on an insufficient NOAA study in assessing the environmental sensitivity of the OCS planning areas in the Leasing Program.  *See* 43 U.S.C. § 1344(a)(2)(G).

First, as we did with Petitioners' OCSLA-based climate change claims, we conclude that Petitioners have standing to bring these remaining two OCSLA-based claims.  Petitioners have shown that they possess a threatened particularized interest, namely their enjoyment of the indigenous animals of the Alaskan areas listed in the Leasing Program, and that they have a sufficiently immediate and definite interest in enjoyment of the animals.  Second, Petitioners have also shown, solely for the sake of Article III standing analysis, that Interior's adoption of an irrationally based Leasing Program could cause a substantial increase in the risk to their enjoyment of the animals affected by the offshore drilling, and that our setting aside and remand of the Leasing Program would redress their harm.  We also conclude that both of these remaining OCSLA-based claims are ripe for review, as both concern OCSLA requirements that are implicated at the initial stage of a leasing program. Accordingly, we may also proceed to the merits of these two claims.

### III. MERITS OF THE REMAINING JUSTICIABLE CLAIMS

#### A. Standard of Review

This court utilizes a "hybrid" standard of review when reviewing a leasing program for compliance with OCSLA. *See Watt I*, 668 F.2d at 1300. Findings of ascertainable fact are guided by the substantial evidence test. *Id.* at 1302. Under this standard, evidence upon which a finding is made must be "more than a scintilla," but may be less than a preponderance of the evidence. *FPL Energy Maine Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002). An agency's policy judgments are reviewed to ensure that "the decision is based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Watt I*, 668 F.2d at 1302. This court gives substantial deference to the Secretary of Interior's interpretation of ambiguous provisions in OCSLA, so long as that interpretation is a "permissible construction of the statute." *See id.* at 1302-03. However, a statutory interpretation that does not effectuate Congress' intent must fall. *Id.* at 1303.

#### B. OCSLA-based Climate Change Claims

Petitioners raise two distinct but related OCSLA-based climate change claims. First, Petitioners argue that the Secretary violated sections 18(a)(1) and (a)(3) of OCSLA by failing to account for the environmental costs resulting from consumption of the fossil fuels extracted from the OCS. Second, Petitioners contend that Interior violated section 18(a)(2) of OCSLA because Interior failed to adequately consider climate change caused by consumption of these fossil fuels and the present and future impact of climate change on OCS areas as section 18(a)(2)(H) requires. To the extent these claims concern Interior's alleged failure to consider the effects brought about by

*consumption* of oil and gas extracted under the Program, we hold that OCSLA does not require Interior to consider the global environmental impact of oil and gas consumption before approving a Leasing Program. Therefore, OCSLA does not require Interior to consider the further derivative environmental impact that oil and gas consumption has on OCS areas. Accordingly, Petitioners' OCSLA climate change claims fail.

Contrary to Petitioners' claims, the text of OCSLA does not require Interior to consider the impact of *consuming* oil and gas extracted under an offshore Leasing Program. Under Section 18(a) of OCSLA, Interior must prepare Leasing Programs so that "the size, timing, and location of leasing activity . . . will best meet national energy needs." 43 U.S.C. § 1344(a). Section 18(a)(1) states further that Interior must consider the values of resources "contained in the outer Continental Shelf," as well as "the potential impact of oil and gas *exploration* on other resource values of the [OCS] and the marine, coastal and human environments." 43 U.S.C. § 1344(a)(1) (emphasis added). Similarly, section 18(a)(3) states that "[t]he Secretary shall select the timing and location of leasing . . . so as to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone." 43 U.S.C. § 1344(a)(3). We noted in *Watt I* that such a cost-benefit analysis of oil and gas extraction under section 18(a)(3) is satisfactory when an individual area's potential benefits are weighed against its potential costs. *See Watt I*, 668 F.2d at 1318. The Secretary therefore need only consider the "potential for environmental damage" on a localized area basis. And, under section 18(a)(2), Interior is required to determine the impacts of "exploration, development, and production" of oil and gas. As the statutory language and our precedent show, Interior's obligations under OCSLA extend to assessing the relative impacts of production and extraction of oil and gas on the localized areas in and around

where the drilling and extraction occurred. Interior need not consider the impacts of the *consumption* of oil and gas after it has been extracted from the OCS. OCSLA therefore concerns the local environmental impact of leasing activities in the OCS and does not authorize—much less require—Interior to consider the environmental impact of post-exploration activities such as consuming fossil fuels on either the world at large, or the derivative impact of global fossil fuel consumption on OCS areas.

Moreover, Interior's continuing duty to promulgate five-year Leasing Programs under OCSLA renders Interior's consideration of the effects of oil and gas consumption unnecessary. Petitioners argue that Interior's consideration of the environmental impacts of greenhouse emissions associated with the Program might have altered Interior's ultimate decisions concerning the Program's leasing activities, such that the OCS areas at issue here might not have been included in the Program. But Petitioners' argument ignores the fact that Interior's decisions about the size and location of leasing areas or the timing of oil and gas extraction do not affect the impact that *consuming* oil and gas may have on climate change. That environmental impact is the same regardless of where and how the oil and gas are extracted. Therefore, even if, as Petitioners assert, Interior were not to adopt the Program at issue here, Interior's continuing duty to promulgate Leasing Programs would compel it to promulgate a different Leasing Program, potentially approving oil and gas extraction from other areas of the OCS. This extraction would presumably lead to the same overall consumption effects as those under the current Program.

Petitioners' consumption-related claims appear to stem from the flawed premise that, before Interior approves an offshore oil and gas Leasing Program, it must first consider whether it should extract oil and gas from the OCS at all. But

Congress has already decided that the OCS should be used to meet the nation's need for energy. Indeed, OCSLA instructs Interior to ensure that oil and gas are extracted *from the OCS* in an expeditious manner that minimizes the *local* environmental damage to the OCS. *See* 43 U.S.C. § 1344. Interior simply lacks the discretion to consider any global effects that oil and gas consumption may bring about. Interior was therefore correct to point out in its EIS that the more expansive effect of oil and gas consumption is a matter for the Congress to consider "when decisions are made regarding the role of oil and gas generally, including domestic production and imports, in the Nation's overall energy policy." Consequently, it was unnecessary for Interior to consider the climate change effects brought about by the consumption of oil and gas—either as oil and gas consumption affects the global environment generally or the OCS areas specifically.

Interior's decision to limit its inquiry to the effect of the Program's *production* activities on climate change is consistent with its obligations under OCSLA, and was not error. Here, there is no doubt that Interior considered the effects of the Program's production activities on climate change generally, and the present and future impact of climate change on the local OCS areas. In the EIS, which Interior incorporated by reference in its Program approval, Interior estimated the total amount of greenhouse gas emissions that would result from leasing, exploration, and development in the OCS, and examined the cumulative impact of these emissions on the global environment. Interior also noted that potential impacts are "most pronounced in [the] Arctic Subregion," and could affect the areas of Alaska in which Petitioners assert an interest. Accordingly, Petitioners' OCSLA-based climate change claims fail.

C.   OCSLA Baseline Information Claim

In their OCSLA baseline data claim, Petitioners contend that Interior lacked sufficient baseline biological information for the Chukchi, Beaufort, and Bering Seas to rationally approve the Leasing Program.  According to Petitioners, Section 20(b) of OCSLA requires Interior to establish, update, and monitor baseline information for OCS planning areas in a leasing program.  *See* 43 U.S.C. § 1346(b).  Petitioners argue that, despite this obligation, Interior has admitted that gaps exist in the data for the Beaufort, Bering, and Chukchi Seas.  Notwithstanding the existence of these information gaps, Interior has indicated that it will defer the gathering of this data to fill these gaps until the Leasing Program reaches the later stages.  Though Petitioners concede that Interior is not required to conduct all the comprehensive baseline research before approving the Leasing Program, Petitioners nevertheless argue that, in order for Interior to comply with OCSLA, Interior must either conduct comprehensive baseline research to fill these information gaps, or provide a research plan detailing how Interior intends to obtain this information before the next OCSLA stages.  Petitioners argue that such a research plan is implicitly required by Section 18(b)(3) of OCSLA, which sets forth Interior's obligation to provide appropriations and staffing estimates for conducting environmental studies and preparing an EIS.  *See* 43 U.S.C. § 1344(b)(3).  Interior's failure to comply with either requirement before approving the Leasing Program has prevented Interior from fully considering Section 18(a)(2)'s factors, which, in turn, has skewed Interior's balancing of those factors under Section 18(a)(3) of OCSLA.  *See* 43 U.S.C. §§ 1344(a)(2)-(3).  As a result, Petitioners argue, the Leasing Program lacks any rational support.

This argument is wholly without merit.  Though Section 20(b) imposes a requirement to conduct additional studies to

establish environmental information for a particular area, this obligation commences "*[s]ubsequent to the leasing and development*" of that area. 43 U.S.C. § 1346(b) (emphasis added). Where, as here, Interior has merely completed the approval stage of a leasing program, Section 20(b)'s additional research requirements are not yet implicated. Indeed, Petitioners' proper concession that Interior is not required to complete its comprehensive baseline research prior to approving the Leasing Program confirms this interpretation. In fact, this concession undermines Petitioners' argument that such research is required at the initial program approval stage. Having made such a concession, Petitioners cannot now credibly argue that Section 20(b) of OCSLA somehow required Petitioners to complete this research before the Leasing Program was approved.

Even if Petitioners were able to rely on Section 20(b) to support their claim that the Leasing Program was irrational due to gaps in the baseline data, this argument would falter because, based on the record, Interior relied on substantial baseline evidence in approving the Leasing Program. As its final EIS demonstrates, Interior considered and chronicled the geological, biological, and environmental information of the Beaufort, Bering, and Chukchi Seas, and many of their inhabitants. To be sure, a review of areas as wide and diversely populated as these Arctic seas will likely miss some of the seas' myriad inhabitants. These gaps in information, however, must be considered in conjunction with the "pyramidic structure" of a five-year leasing program. *Watt I*, 668 F.2d at 1297. At this early stage of the Leasing Program, the existence of some gaps in the baseline data for these three seas is not fatal to the Leasing Program. This is also tempered by the fact that Interior has recognized that such gaps exist and has indicated its intention to conduct additional research to close them. *North Slope*, 642 F.2d at 613 (affirming the district court's denial of petitioners' OCSLA

claim that research was insufficient because Interior acknowledged that "[m]ore research is necessary; the research is being done").

Petitioners are therefore left with their only remaining argument: to comply with OCSLA, Interior must provide a research plan detailing how it attempts to obtain the necessary baseline information before the next stage of the Leasing Program. However, OCSLA does not set forth a requirement that Interior must provide such a plan for obtaining this baseline data. Petitioners' claim that Section 18(b)(3) implicitly sets forth such a requirement is off the mark. Section 18(b)(3) states that a leasing program "shall include estimates of the appropriations and staff required to . . . conduct environmental studies and prepare any environmental impact statement." 43 U.S.C. § 1344(b)(3). In other words, Section 18(b)(3) simply requires that Interior *estimate* how many staff and how much money it needs to obtain environmental impact information. It does not require that Interior set forth a research plan detailing what exact environmental information Interior needs, or how or when Interior plans on obtaining that information. Petitioners' interpretation is therefore counter to the clear language of the statute. Accordingly, Petitioners' baseline data claim must fail.

D.  NOAA Study Claim

Section 18(a)(2)(G) of OCSLA requires agencies to consider "the relative environmental sensitivity of . . . different areas of the outer Continental Shelf." 43 U.S.C. § 1344(a)(2)(G). In its efforts to comply with this requirement, Interior ranked the environmental sensitivity of various program areas in terms of only one factor: the "physical characteristics" of the shoreline of those areas. This ranking was based on Interior's use of the Environmental Sensitivity Index, developed by NOAA, which considered the sensitivity of different

shoreline areas to oil spills, and ranked them on that basis. The study ranked each area on a scale of 1 to 10 (with 10 being a rating for an area most likely to be damaged long-term by oil spills). Petitioners contend that Interior's sole reliance on this study to measure the environmental sensitivity of the potential OCS leasing areas in the Leasing Program renders the Program improper. Interior counters that this court has stated that Section 18(a)(2)(G) "provides no method by which environmental sensitivity . . . [is] to be measured." *Watt I*, 668 F.2d at 1311. Accordingly, Interior argues that its adoption of the NOAA shoreline study to determine environmental sensitivity of OCS areas is a policy judgment that is entitled to substantial deference.

Interior's argument is not consistent with controlling precedent. Our decisions in *California v. Watt* (*Watt II*), 712 F.2d 584 (D.C. Cir. 1983), and *Watt I* set forth the standard for Interior's compliance with Section 18(a)(2)(G). In *Watt II*, we affirmed our holding in *Watt I* that all that is required for compliance with Section 18(a)(2)(G) is "that the Secretary make a good faith determination of the relative environmental sensitivity . . . of the various regions based upon the best 'existing information' available to him." *Watt II*, 712 F.2d at 596 (quoting *Watt I*, 668 F.2d at 1313)). Accordingly, the Secretary was "free to choose any methodology 'so long as it is not irrational.'" *Watt II*, 712 F.2d at 596 (quoting *Watt I*, 668 F.2d at 1320). The Secretary's decision is not irrational so long as it is "based on a consideration of the relevant factors." *Watt I*, 668 F.2d at 1317.

Interior's interpretation of Section 18(a)(2)(G) is irrational. It was not based on a consideration of the relevant factors set forth therein. Section 18(a)(2)(G) states clearly that an agency must assess the environmental sensitivity of "different areas *of the outer Continental Shelf*" in order to make its determination

of when and where to explore and develop additional areas for oil. 43 U.S.C. § 1344(a)(2)(G) (emphasis added). Based on this language alone, Interior's use of the NOAA study runs afoul of this provision because it assesses only the effects of oil spills on shorelines. Interior provides no explanation for how the environmental sensitivity of coastal shoreline areas can serve as a substitute for the environmental sensitivity of OCS areas, when the coastline and proposed leasing areas are so distant from each other. This interpretation runs directly counter to the statutory language.

Moreover, though *Watt II* and *Watt I* afforded Interior a great deal of leeway in determining how to comply with Section 18(a)(2)(G), they did not give Interior carte blanche to wholly disregard a statutory requirement out of convenience. The law plainly requires that Interior examine and compare the environmental sensitivity of different areas of the OCS. Though the law allows Interior to consider the environmental sensitivity of onshore areas to OCS development, it plainly does not allow Interior to consider *only* onshore areas. Interior's sole focus on the environmental sensitivity of shoreline areas to OCS development therefore falls short of what Section 18(a)(2)(G) requires. Accordingly, Interior's Section 18(a)(2)(G) analysis is inadequate.

Our conclusion that Interior failed to properly conduct an environmental sensitivity analysis under Section 18(a)(2)(G) does not end our inquiry. We have consistently linked the adequacy of Interior's analysis under Section 18(a)(2) with its analysis under Section 18(a)(3). *See Watt II*, 712 F.2d at 599 & n.75; *Watt I*, 668 F.2d at 1318. Section 18(a)(3) requires that, when preparing a leasing program, Interior select, "to the maximum extent practicable," the "timing and location of leasing . . . so as to obtain a proper balance between the potential for environmental damage, potential for the discovery of oil and

gas, and the potential for adverse impact on the coastal zone." 43 U.S.C. § 1344(a)(3). In essence, these three elements are "a condensation of the factors specified in section 18(a)(2)." *Watt I*, 668 F.2d at 1315. Though Section 18(a)(3) does not define specifically how Interior shall balance these three elements, *Watt I*, 668 F.2d at 1315, it stands to reason that a flawed consideration of Section 18(a)(2) factors hinders Interior's ability to obtain a proper balance of the factors under Section 18(a)(3). Interior's failure to properly consider the environmental sensitivity of different areas of the OCS—areas *beyond* the Alaskan coastline—has therefore also hindered Interior's ability to comply with Section 18(a)(3)'s balancing requirement.

Consequently, on remand, the Secretary must first conduct a more complete comparative analysis of the environmental sensitivity of different areas "*of the outer Continental Shelf*," 43 U.S.C. § 1344(a)(2)(G) (emphasis added), and "must at least attempt to identify those areas whose environment and marine productivity are most and least sensitive to OCS activity." *Watt I*, 668 F.2d at 1313. Though Interior may ultimately conclude as a result of this additional analysis that the shorelines of the Beaufort, Bering, and Chukchi Seas are the areas that are most sensitive to OCS development, such a conclusion cannot be reached without considering the effects of development on areas of the OCS in addition to the shoreline. Once Interior has conducted its Section 18(a)(2)(G) analysis, Interior must then determine whether its reconsideration of the environmental sensitivity analysis warrants the exclusion of any proposed area in the Leasing Program. *See Watt I*, 668 F.2d at 1314. Finally, having reconsidered its Section 18(a)(2) analysis, Interior must reassess the timing and location of the Leasing Program "so as to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone," as

required by Section 18(a)(3).  43 U.S.C. § 1344(a)(3).

## IV.  RELIEF

Section 23(c)(6) of OCSLA provides that, on review, a court of appeals "may affirm, vacate, or modify any order or decision or may remand the proceedings to the Secretary for such further action as it may direct."  43 U.S.C. § 1349(c)(6). Petitioners request that we vacate the Leasing Program and remand the Program to Interior for additional reconsideration. In light of Interior's failure to properly consider the relative environmental sensitivity and marine productivity of different areas of the OCS under Section 18(a)(2)(G), and its derivative failure to strike a proper balance incorporating environmental and coastal zone factors under Section 18(a)(3), we grant the relief requested.  Therefore, we vacate the Leasing Program and remand the Program to the Secretary for reconsideration in accordance with this opinion.

*So ordered.*

ROGERS, *Circuit Judge*, concurring: I join the court's opinion, but I write separately to emphasize two points. First, because the court holds petitioners have standing to bring their climate change claims on their "procedural theory" of standing, Op. at 16-18, it is unnecessary for the court to reach the question whether petitioners would also have standing under their "substantive theory" of standing, Op. at 10-16, *see, e.g.*, *U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1331 n.4 (D.C. Cir. 2002). Determining the precise scope of the holding on standing in *Massachusetts v. EPA*, 549 U.S. 497 (2007), and whether the Native Village of Point Hope has identified by affidavit particularized harms to its culture and way of life from climate change sufficient to establish Article III standing, for example, remain for another day, *see Gersman v. Group Health Ass'n, Inc.*, 975 F.2d 886, 897 (D.C. Cir. 1992). Second, as this appeal concerns only stage one of the Secretary's 5-Year Leasing Program (2007-2012) under OCSLA, the court has no occasion to opine regarding the Secretary's discretion to consider the global effects of oil and gas consumption, Op. at 29, other than to hold that the Secretary is not required by OCSLA to consider such effects at stage one.