REVISED October 22, 2009

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 16, 2009

Charles R. Fulbruge III
Clerk

No. 07-60756

NED COMER, ET AL.

Plaintiffs-Appellants

v.

MURPHY OIL USA, ET AL.

Defendants-Appellees

Appeal from the United States District Court
for the Southern District of Mississippi

Before DAVIS, STEWART, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

The plaintiffs, residents and owners of lands and property along the Mississippi Gulf coast, filed this putative class action in the district court against the named defendants, corporations that have principal offices in other states but are doing business in Mississippi. The plaintiffs allege that defendants' operation of energy, fossil fuels, and chemical industries in the United States caused the emission of greenhouse gasses that contributed to global warming, viz., the increase in global surface air and water temperatures, that in turn caused a rise in sea levels and added to the ferocity of Hurricane Katrina, which combined to destroy the plaintiffs' private property, as well as public property

useful to them. The plaintiffs' putative class action asserts claims for compensatory and punitive damages based on Mississippi common-law actions of public and private nuisance, trespass, negligence, unjust enrichment, fraudulent misrepresentation, and civil conspiracy. The plaintiffs invoked the district court's subject-matter jurisdiction based on diversity of citizenship.[1] The plaintiffs do not assert any federal or public law actions and do not seek injunctive relief.

Defendants moved to dismiss plaintiffs' claims on the grounds that the plaintiffs lack standing to assert their claims and that their claims present nonjusticiable political questions. The district court granted the motion and dismissed the claims.[2] The plaintiffs timely appealed. For the reasons discussed

---

[1] We have subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2), which provides "[t]he district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2). Plaintiffs' suit satisfies the elements of § 1332(d) because the suit is a class action, the amount in controversy exceeds $5,000,000, and at least one member of the class of plaintiffs is diverse from at least one defendant. See Frazier v. Pioneer Americas LLC, 455 F.3d 542, 545 (5th Cir. 2006).

Though plaintiffs' complaint does not seek recovery of a specific amount, the large class of plaintiffs, "residents of and/or property owners in the state of Mississippi who suffered loss and harm as a result of Hurricane Katrina," and the extent of damages sought, including personal injury and property damage resulting from Hurricane Katrina, makes it "facially apparent that at least $5 million is in controversy." Frazier, 455 F.3d at 545; see also Allen v. R&H Oil & Gas Co., 63 F.3d 1326, 1335 (5th Cir. 1995) (holding that when a complaint alleges no specific amount of damages, the amount in controversy requirement may be met "if it is facially apparent that the claims are likely above [the requisite amount]").

[2] The district court did not issue a written opinion in this case but rather offered its ruling from the bench. The district court's reasoning is recorded in the hearing transcripts.

The district court began its analysis of the political question doctrine by stating "that the problem [in this case] is one in which this court is simply ill-equipped or unequipped with the power that it has to address these issues." Describing this suit as a "debate" about global warming, the district court further reasoned:

 [I]t is a debate which simply has no place in the court, until such time as Congress enacts legislation which sets appropriate standards by which this court can measure conduct . . . and develops standards by which . . . juries can adjudicate facts and apply the law. . . . Under the circumstances, I think that

herein, we conclude that the plaintiffs have standing to assert their public and private nuisance, trespass, and negligence claims, and that none of these claims present nonjusticiable political questions; but we conclude that their unjust enrichment, fraudulent misrepresentation, and civil conspiracy claims must be dismissed for prudential standing reasons. Accordingly, we reverse the district court's judgment, dismiss the plaintiffs' suit in part, and remand the case to the district court for further proceedings.

## I.

Plaintiffs' public and private nuisance claims assert that defendants intentionally and unreasonably used their property so as to produce massive amounts of greenhouse gasses and thereby injure both plaintiffs and the general public by contributing to global warming, which caused the sea level rise and added to the ferocity of Hurricane Katrina, the combined effects of which resulted in the destruction of plaintiffs' private property, as well as their loss of use of certain public property in the vicinity of their dwellings. Plaintiffs' trespass claim asserts that defendants' greenhouse gas emissions caused saltwater, debris, sediment, hazardous substances, and other materials to enter,

---

the plaintiffs are asking the court to develop those standards, and it is something that this court simply is not empowered to do.

Finally, the district court concluded:

[Plaintiffs' complaint asks] this court to do what Baker v. Carr told me not to do, and that is to balance economic, environmental, foreign policy, and national security interests and make an initial policy determination of a kind which is simply nonjudicial. Adjudication of Plaintiffs' claims in this case would necessitate the formulation of standards dictating, for example, the amount of greenhouse gas emissions that would be excessive and the scientific and policy reasons behind those standards. These policy decisions are best left to the executive and legislative branches of the government, who are not only in the best position to make those decisions but are constitutionally empowered to do so.

3

remain on, and damage plaintiffs' property. Plaintiffs' negligence claim asserts that defendants have a duty to conduct their businesses so as to avoid unreasonably endangering the environment, public health, public and private property, and the citizens of Mississippi; that defendants breached this duty by emitting substantial quantities of greenhouse gasses; and that these emissions caused plaintiffs' lands and property to be destroyed or damaged.

Additionally, the plaintiffs' unjust enrichment claim asserts that certain defendants artificially inflated the price of petrochemicals, such as gasoline, diesel fuel, and natural gas, and realized profits to which they are not lawfully entitled and which, in part, rightfully belong to plaintiffs. Plaintiffs' civil conspiracy claim asserts that certain defendants were aware for many years of the dangers of greenhouse gas emissions, but they unlawfully disseminated misinformation about these dangers in furtherance of a civil conspiracy to decrease public awareness of the dangers of global warming. Finally, plaintiffs' fraudulent misrepresentation claim asserts that defendants knowingly made materially false statements in public relations campaigns to divert attention from the dangers of global warming, so as to dissuade government regulation, public discontent and consumer repulsion; that both government actors and the general public were unaware that these statements were false; that government officials and the general public acted upon defendants' statements; and that plaintiffs suffered injuries as a result of that reliance.

"The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 95 (1998) (quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)); see also Juidice v. Vail, 430 U.S. 327, 331 (1977) ("[W]e are first obliged to examine the standing of appellees, as a matter of the case-or-controversy requirement associated with Art. III") "The standing inquiry

is both plaintiff-specific and claim-specific. Thus, a reviewing court must determine whether each particular plaintiff is entitled to have a federal court adjudicate each particular claim that he asserts." Pagan v. Calderon, 448 F.3d 16, 26 (1st Cir. 2006) (citing Allen v. Wright, 468 U.S. 737, 752 (1984)).

Because this is a diversity case involving state common-law rights of action, plaintiffs must satisfy both state and federal standing requirements. See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 173 (2d Cir. 2005) ("Where, as here, jurisdiction is predicated on diversity of citizenship, a plaintiff must have standing under both Article III of the Constitution and applicable state law in order to maintain a cause of action."); see also Metro. Exp. Services, Inc. v. City of Kansas City, 23 F.3d 1367, 1369–70 (8th Cir. 1994); City of Moore v. Atchison, Topeka, & Santa Fe Ry. Co., 699 F.2d 507, 511 (10th Cir. 1983); Owen of Georgia, Inc. v. Shelby County, 648 F.2d 1084, 1088–90 (6th Cir. 1981); 13B Charles A. Wright, et al., Federal Practice & Procedure § 3531.14 n.28 (3d ed. 2009).

Plaintiffs' claims easily satisfy Mississippi's "liberal standing requirements." See Van Slyke v. Board of Trustees of State Institutions of Higher Learning, 613 So.2d 872, 875 (1993) ("Van Slyke II"). The Mississippi Constitution provides that "[a]ll courts shall be open; and every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice shall be administered without sale, denial, or delay," Miss. Const. art. III § 24. Because Mississippi's Constitution does not limit the judicial power to cases or controversies, its courts have been more permissive than federal courts in granting standing to parties. See Van Slyke II, 613 So.2d at 875 (citing Board of Trustees v. Van Slyke, 510 So.2d 490, 496 (Miss. 1987) ("Van Slyke I"); Dye v. State ex rel. Hale, 507 So.2d 332, 338 (Miss. 1987); Canton Farm Equip., Inc. v. Richardson, 501 So.2d 1098, 1106-1107 (Miss. 1987)). "In Mississippi, parties have standing to sue 'when they

5

assert a colorable interest in the subject matter of the litigation or experience an adverse effect from the conduct of the defendant, or as otherwise provided by law.'" State v. Quitman County, 807 So.2d 401, 405 (Miss. 2001) (quoting Fordice v. Bryan, 651 So.2d 998, 1003 (Miss. 1995); State ex rel. Moore v. Molpus, 578 So.2d 624, 632 (Miss. 1991)). The plaintiffs clearly allege that their interests in their lands and property have been damaged by the adverse effects of defendants' greenhouse gas emissions. Accordingly, they have standing to assert all of their claims under Mississippi law.

In our federal standing inquiry, more rigorous standards apply. Article III of the United States Constitution limits federal-court jurisdiction to "Cases" and "Controversies." "Those two words confine 'the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process.'" Massachusetts v. E.P.A., 549 U.S. 497, 516 (2007) (quoting Flast v. Cohen, 392 U.S. 83, 95 (1968)).

Article III standing is an "irreducible constitutional minimum," which requires plaintiffs to demonstrate: they have suffered an "injury in fact"; the injury is "fairly traceable' to the defendant's actions; and the injury will "likely . . . be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotations and citations omitted). The claimant bears the burden of establishing standing, and "each element [of the three-part standing inquiry] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 560-61. When considering standing "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." Bennett v. Spear, 520 U.S. 154, 168 (1997) (internal quotation marks omitted) (quoting Lujan, 504 U.S. at 561);

6

see also Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc., 501 U.S. 252, 264-65 (1991) ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint." (citations omitted)); Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 109-10 (1979); Warth v. Seldin, 422 U.S. 490, 501 (1975); Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc., 32 F.3d 205, 207 (5th Cir. 1994) (quoting Warth, 422 U.S. at 501).

In our federal standing analysis in this case, it is helpful to divide the plaintiffs' claims into two sets and apply the standards in turn to each group: First, the plaintiffs' public and private nuisance, trespass, and negligence claims, all of which rely on allegations of a causal link between greenhouse gas emissions, global warming, and the destruction of the plaintiffs' property by rising sea levels and the added ferocity of Hurricane Katrina; and, second, the plaintiffs' unjust enrichment, civil conspiracy, and fraudulent misrepresentation claims based on plaintiffs' alleged injuries caused by defendants' public relations campaigns and pricing of petrochemicals.

In their nuisance, trespass and negligence claims, the plaintiffs have clearly satisfied the first and third constitutional minimum standing requirements. These state common-law tort claims, in which plaintiffs allege that they sustained actual, concrete injury in fact to their particular lands and property, can be redressed by the compensatory and punitive damages they seek

for those injuries.[3] As to these claims, defendants do not contest standing on the

---

[3] For the first set of claims, the plaintiffs assert private, common-law claims of the sort that have been long recognized to give rise to standing, see, e.g., Erwin Chemerinsky, Federal Jurisdiction 69 (5th ed. 2007) ("Injury to rights recognized at common law – property, contracts, and torts – are sufficient for standing purposes."); the plaintiffs do not assert any public-law claims that might raise concerns the standing doctrine is designed to guard against, see Charles A. Wright & Mary Kay Kane, Law of Federal Courts 69 (6th ed. 2002) ("The law of standing is almost exclusively concerned with public-law questions involving determinations of constitutionality and review of administrative or other governmental action. In theory, of course, it is not so limited. The person suing for breach of contract or for a tort must be found to be the real party of interest, but in practice those suits are brought only by a person harmed by the supposed wrong, and standing to sue is self-evident. It is only when a question is of a public nature that the interested bystander is likely to attempt suit.").

As a number of scholars have noted, throughout American history lawsuits between private parties over private rights, such as the common-law claims asserted here, have not triggered the standing concerns that public-law cases, calling for vindication of constitutional or statutory policies, have. See, e.g., Abram Chayes, The Role of the Judge in Public Law Litigation, 89 Harv. L. Rev. 1281, 1290-91 (1976) ("The standing issue could hardly arise at common law or under early code pleading rules, that is, under the traditional model. There the question of plaintiff's standing merged with the legal merits: On the facts pleaded, does this particular plaintiff have a right to the particular relief sought from the particular defendant from whom he is seeking it?"); Ann Woolhandler & Caleb Nelson, Does History Defeat Standing Doctrine?, 102 Mich. L. Rev. 689, 690-94 (2004) (noting that throughout American history private litigation asserting private rights, including individuals' rights in property and bodily integrity, has not raised standing concerns); Cass R. Sunstein, Standing and the Privatization of Public Law, 88 Colum. L. Rev. 1432, 1439 (1988) (observing that "the existence of an interest protected at common law [has been] sufficient to confer standing").

This case presents common-law tort claims with allegations of actual injury and is therefore distinguishable from Center for Biological Diversity v. U.S. Department of Interior, 563 F.3d 466, 479 (D.C. Cir. 2009), for example. In Center for Biological Diversity, the plaintiffs sued the Department of Interior in respect to its leasing program, which permitted drilling on the Outer Continental Shelf, because more drilling will cause more oil consumption, causing more emissions, and, in turn, increase global warming and hurt animals and their habitats thereby harming the plaintiffs' enjoyment. Id. at 478-79. The D.C. Circuit, in an alternative holding, found no standing because the claims failed to satisfy the traceability requirement. Id. However, the D.C. Circuit found that the plaintiffs could only speculate that the damages will occur only if many different actors (oil companies, consumers, car manufacturers, and the department of Interior) all acted in a way that would increase global warming to cause damage. Id. Here, the plaintiffs, instead, make allegations, taken as true, that a past causation link led to their particularized damage – therefore, the alleged harms to the plaintiffs' specific property and persons are "traceable" to the Defendants without speculation as to the Defendants' and third parties' future actions and interactions. See id. at 489 (Rogers, J., concurring) (noting that if the Plaintiffs had alleged particular harms caused by global warming, they may have standing); see also City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983) (differentiating for standing purposes the speculative nature of potential future harm created by a policy with suit for actual damages from an alleged past application of that policy).

first and third prongs of the tripartite test.

Defendants instead challenge the plaintiffs' standing at the second prong of the federal standing inquiry. They argue that the plaintiffs have not shown that the harms alleged are fairly traceable to defendants' actions. Defendants contend that the plaintiffs' theory tracing their injuries to defendants' actions is too attenuated. However, this argument, which essentially calls upon us to evaluate the merits of plaintiffs' causes of action, is misplaced at this threshold standing stage of the litigation. It is firmly established "that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the courts' statutory or constitutional power to adjudicate the case." Steel Co., 523 U.S. at 89 (citing generally 5A Wright & Miller, Federal Practice and Procedure § 1350 n.8 and cases cited (2d ed. 1990)). As the Supreme Court stated in Bell v. Hood, 327 U.S. 678, 685 (1946), "[j]urisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." More specifically, for issues of causation, the Article III traceability requirement "need not be as close as the proximate causation needed to succeed on the merits of a tort claim. Rather, an indirect causal relationship will suffice, so long as there is 'a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant.'" Toll Bros., Inc. v. Township of Readington, 555 F.3d 131, 142 (3d Cir. 2009); see also Bennett v. Spear, 520 U.S. 154, 168 (1997) ("[P]roximate cause" of ["plaintiffs'] harm" is not equivalent with their "injury 'fairly traceable' to the defendant" for standing purposes); Friends for Ferrell Parkway, LLC v. Stasko, 282 F.3d 315, 324 (4th Cir. 2002) ("[T]he 'fairly traceable' standard is 'not equivalent to a requirement of tort causation.'"); Tozzi v. U.S. Dep't of Health

and Human Servs.,271 F.3d 301, 308 (D.C. Cir. 2001) ("[W]e have never applied a 'tort' standard of causation to the question of traceability.").

Plaintiffs' complaint, relying on scientific reports, alleges a chain of causation between defendants' substantial emissions and plaintiffs' injuries, and while plaintiffs will be required to support these assertions at later stages in the litigation, at this pleading stage we must take these allegations as true. Cf. Bennett, 520 U.S. at 154 (accepting plaintiffs' pleadings as true and holding that the alleged injury, loss of water for irrigation, was fairly traceable to a Fish and Wildlife Service biological opinion recommending that water in lakes be maintained at a minimum level to protect endangered fish); Metro. Wash. Airport Auth., 501 U.S. at 264-65 (accepting plaintiffs' pleadings as true and holding, in an action challenging the constitutionality of the airport authority's veto power over increased airport construction, that allegations that the construction plan would result in increased airport noise, pollution, and danger of accidents constituted a personal injury to plaintiffs that was fairly traceable to the review board's veto power).

What is more, the defendants' main contentions are similar to those recently rejected by the Supreme Court in Massachusetts v. EPA. Essentially, they argue that traceability is lacking because: (1) the causal link between emissions, sea level rise, and Hurricane Katrina is too attenuated, and (2) the defendants' actions are only one of many contributions to greenhouse gas emissions, thereby foreclosing traceability.

In holding that Massachusetts had standing to challenge the EPA's decision not to regulate the emission of greenhouse gasses, see Massachusetts, 549 U.S. at 522-23, the Court accepted as plausible the link between man-made greenhouse gas emissions and global warming, id. at 523 (noting the "causal connection between man-made greenhouse gas emissions and global warming" in finding that "EPA does not dispute the existence of a causal connection

between man-made greenhouse gas emissions and global warming. At a minimum, therefore, EPA's refusal to regulate such emissions 'contributes' to Massachusetts' injuries"), as well as the nexus of warmer climate and rising ocean temperatures with the strength of hurricanes, id. at 521-24. The Supreme Court noted that

> [t]he harms associated with climate change are serious and well recognized. . . . [R]ising ocean temperatures may contribute to the ferocity of hurricanes. . . . According to petitioners' unchallenged affidavits, global sea levels rose somewhere between 10 and 20 centimeters over the 20th century as a result of global warming. . . . These rising seas have already begun to swallow Massachusetts' coastal land.

Id. at 521-23 (citing a scientific report from a climate scientist). Thus, the Court accepted a causal chain virtually identical in part to that alleged by plaintiffs, viz., that defendants' greenhouse gas emissions contributed to warming of the environment, including the ocean's temperature, which damaged plaintiffs' coastal Mississippi property via sea level rise and the increased intensity of Hurricane Katrina.[4] In fact, the Massachusetts Court recognized a causal chain extending one step further —– i.e., that because the EPA did not regulate greenhouse gas emissions, motor vehicles emitted more greenhouse gasses than they otherwise would have, thus contributing to global warming, which injured

---

[4] The Court also recognized that the impact of Hurricane Katrina is arguably a result of this causation link. See Massachusetts, 549 U.S. at 522 n.18.

Massachusetts lands through sea level rise and increased storm ferocity.[5] Accordingly, the defendants' contention here is without merit.

Defendants' contention that traceability is lacking because their emissions contributed only minimally to plaintiffs' injuries is also similar to another EPA argument rejected by the Supreme Court in Massachusetts. In rejecting the EPA's argument that its regulation of domestic new car emissions would have insignificant, if any, salutary effect on global warming, the Court concluded that "[a]t a minimum . . . EPA's refusal to regulate [greenhouse gas] emissions 'contributes' to Massachusetts' injuries," and therefore sufficiently demonstrates traceability so as to support Massachusetts' standing. 549 U.S. at 523. Thus, the Court recognized, in the same context as the instant case, that injuries may be fairly traceable to actions that contribute to, rather than solely or materially cause, greenhouse gas emissions and global warming.

This holding -- that alleged contribution to the harm is sufficient for traceability purposes -- is consistent with the standing case-law in other contexts. "[T]he fact that the defendant is only one of several persons who caused the harm does not preclude a finding of causation sufficient to support standing." 15 James Wm. Moore et al., Moore's Federal Practice § 101.41[1] (3d ed. 2008) (citing Lac Du Flambeau Band of Lake Superior v. Norton, 422 F.3d 490, 500-501 (7th Cir. 2005)). We have held, agreeing with the Third and Fourth

---

[5] The Massachusetts Court stated that Massachusetts was "entitled to special solicitude in our standing analysis" because it is a state. 549 U.S. at 520. However, the chain of causation at issue here is one step shorter than the one recognized in Massachusetts, so these plaintiffs need no special solicitude.

Indeed, unlike in other cases in which courts have held that traceability was lacking, e.g., Allen v. Wright, 468 U.S. 737, 757-59 (1984), the causal chain alleged by these plaintiffs does not depend on independent superseding actions by parties that are not before the court. Cf. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Nor does it rely on speculation about what the effects of the defendants' actions will be, or about the actions anyone will take in the future. Cf. Whitmore v. Arkansas, 495 U.S. 149, 157-58 (1990). It involves only the predictable effects of the defendants' past actions on the natural environment, and the resulting harm to the plaintiffs' property.

Circuits, that to satisfy the "fairly traceable" element of standing plaintiffs need not "show to a scientific certainty that defendant's [pollutants], and defendant's [pollutants] alone, caused the precise harm suffered by the plaintiffs." Save Our Community v. E.P.A., 971 F.2d 1155, 1161 (5th Cir. 1992) (quoting Pub. Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc., 913 F.2d 64, 72 (3d Cir. 1990); Natural Res. Defense Council, Inc. v. Watkins, 954 F.2d 974, 980 n.7 (4th Cir. 1992)); see also Natural Res. Defense Council v. Sw. Marine, Inc., 236 F.3d 985, 995 (9th Cir. 2000). In other words, this Circuit has articulated the "fairly traceable" test not as an inquiry into whether a defendant's pollutants are the sole cause of an injury but rather whether "the pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs." Sierra Club v. Cedar Point Oil Co., 73 F.3d 546, 557 (5th Cir. 1996) (emphasis added) (quoting Powell Duffryn Terminals Inc., 913 F.2d at 72); see Texans United for a Safe Economy Educ. Fund v. Crown Cent. Petroleum, 207 F.3d 789, 793 (5th Cir. 2000); Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp., 95 F.3d 358, 361 (5th Cir. 1996); accord. Powell Duffryn, 913 F.2d at 72; Piney Run Pres. Ass'n v. County Comm'rs of Carroll County, 268 F.3d 255, 263-64 (4th Cir. 2001) ("Traceability does not mean that plaintiffs must show to a scientific certainty that defendant's [pollution] caused the precise harm suffered by the plaintiffs. Rather, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged." (internal citations and quotations omitted)); Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n, 389 F.3d 536, 543 (6th Cir. 2004) (adopting the reasoning of Piney Run, 268 F.3d at 263-64); Loggerhead Turtle v. County Council of Volusia County, 148 F.3d 1231, 1247 (11th Cir. 1998) ("[S]tanding is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties." (citing Lujan, 504 U.S. at 560)). The en banc Fourth Circuit

concluded: "Rather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 161 (4th Cir. 2000) (en banc) (citation and internal quotation marks omitted).[6]

Here, the plaintiffs' complaint alleges that defendants' emissions caused the plaintiffs' property damage, which is redressable through monetary damages; for example, the plaintiffs allege that defendants' willful, unreasonable use of their property to emit greenhouse gasses constituted private nuisance under Mississippi law because it inflicted injury on the plaintiffs' land by causing both land loss due to sea level rise and property damage due to Hurricane Katrina. See, e.g., Comet Delta, Inc. v. Pate Stevedore Co. of Pascagoula, Inc., 521 So.2d 857, 859 (Miss. 1988) ("One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is . . . intentional and unreasonable." (quoting Restatement (Second) of Torts §

---

[6] Defendants try to distinguish the above precedents on the ground that they are unique Clean Water Act ("CWA") cases. Contrary to defendants' argument or suggestion, the Clean Water Act could not and did not lower the constitutional minimum standing requirements and make CWA cases inapposite here. The CWA's "grant of standing reaches the outer limits of Article III . . . Thus, if a Clean Water Act plaintiff meets the constitutional requirements for standing, then he ipso facto satisfies the statutory threshold as well." Friends of the Earth, 204 F.3d at 155; accord Save Our Community, 971 F.2d at 1161 n.11; Envtl. Conservation Org. v. City of Dallas, 529 F.3d 519, 526 (5th Cir. 2008). In other words, constitutional minimum standing requirements cannot be lowered by Congress and the constitutional standing jurisprudence under the CWA is fully applicable in this case. See Friends of the Earth, 204 F.3d at 155. Moreover, the reasoning of these standing decisions has been applied to other contexts. See, e.g., Interfaith Community Org. v. Honeywell Int'l, Inc., 399 F.3d 248, 257 (3d Cir. 2005) (quoting Powell Duffryn, 913 F.2d at 72); Ocean Advocates v. U.S. Army Corps of Engineers, 402 F.3d 846, 860 (9th Cir. 2005) (holding that "contribution" to the injury is sufficient to satisfy the constitutional traceability requirement); St. Pierre v. Dyer, 208 F.3d 394, 402 (2d Cir. 2000) (same). By satisfying standing under the tests announced in the precedents above, the plaintiffs have satisfied constitutional standing requirements.

822)). Similarly, the plaintiffs allege that defendants' emissions constituted a public nuisance because they unreasonably interfered with a common right of the general public by causing the loss of use and enjoyment of public property through erosion of beaches, rising sea levels, saltwater intrusion, habitat destruction, and storm damage. See id. at 860 ("A public nuisance is an unreasonable interference with a right common to the general public." (quoting Restatement (Second) of Torts § 821B)). Because the injury can be traced to the defendants' contributions, the plaintiffs' first set of claims satisfies the traceability requirement and the standing inquiry.

The plaintiffs' second set of claims (unjust enrichment, fraudulent misrepresentation, and civil conspiracy) do not satisfy federal prudential standing requirements. The Supreme Court has described the prudential standing doctrine in this way:

> [O]ur standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, see Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-562(1992); and prudential standing, which embodies "judicially self-imposed limits on the exercise of federal jurisdiction," Allen, 468 U.S., at 751. The Article III limitations are familiar: The plaintiff must show that the conduct of which he complains has caused him to suffer an "injury in fact" that a favorable judgment will redress. See Lujan, 504 U.S., at 560-561. Although we have not exhaustively defined the prudential dimensions of the standing doctrine, we have explained that prudential standing encompasses "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." Allen, 468 U.S., at 751. See also Secretary of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 955-956 (1984). "Without such limitations -- closely related to Art. III concerns but essentially matters of judicial self-governance -- the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and

even though judicial intervention may be unnecessary to protect individual rights." Warth, 422 U.S., at 500.

Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 11-12 (2004).[7] Each of the plaintiffs' second set of claims presents a generalized grievance that is more properly dealt with by the representative branches and common to all consumers of petrochemicals and the American public. "[N]o matter how well intended, Plaintiffs have done little more than present a generalized grievance, common to all citizens or litigants in [the United States], and as such, lack standing." Public Citizen, Inc. v. Bomer, 274 F.3d 212, 219 (5th Cir. 2001); see also Arizonans for Official English v. Arizona, 520 U.S. 43, 64 (1997) ("An interest shared generally with the public at large in the proper application of the Constitution and laws will not [create standing]."); Lujan, 504 U.S. at 573-74 ("We have consistently held that a plaintiff raising only a generally available grievance about government-claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief [that] no more directly and tangibly benefits him than it does the public at large -- does not state an Article III case or controversy."); see generally Hein v. Freedom From Religion Foundation, Inc., 127 S.Ct. 2553, 2564 & n.2 (2007) (listing cases). Unlike the first set of claims, the plaintiffs do not identify a particularized "injury [that] must affect the plaintiff in a personal and individual way." Lujan, 504 U.S. at 560 & n.1. The source of the plaintiffs' second set of grievances is the alleged failure of the government to properly regulate and enforce environmental laws (caused by the defendants' engagement in an allegedly false public marketing campaign and wrongful dissuasion of

---

[7] The nuisance, trespass, and negligence claims are clearly not barred by any aspect of the prudential standing doctrine. The plaintiffs do not seek to raise anyone else's legal rights; they have asserted particularized injuries, not generalized grievances; and their injuries involve the type of interests that have traditionally been protected by the body of law they invoke, namely the common law of Mississippi.

government regulation) and therefore enabled the defendants to increase their prices and profits. As the plaintiffs allege in their complaint:

> At the time Defendants made these materially false statements [about Global Warming], the public and State and Federal Governments did not know that Defendants' statements were false. The State and Federal Governments, acting upon Defendants' statements and representations, refused to regulate greenhouse gas emissions. The public had a right to rely and did rely upon Defendants' statements, and continued to consume products in ways that increased Global Warming, all of which resulted in continued and increased profits to the Defendants. Plaintiffs' and Plaintiff Class's injuries were proximately caused by that reliance.

The interests at stake involve every purchaser of petrochemicals and the entire American citizenry because the plaintiffs are essentially alleging a massive fraud on the political system resulting in the failure of environmental regulators to impose proper costs on the defendants. Cf. In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122, 130 (9th Cir. 1973) ("Insofar as the common weal was injured the federal government was the proper party to seek redress . . . . If the Government did not prosecute its action with sufficient vigor, the remedy lies in executive or legislative reform, not in judicial overreaching."). Such a generalized grievance is better left to the representative branches; we refuse to entertain the second set of claims based on the prudential standing doctrine.

## II.

Since the plaintiffs have standing to bring their nuisance, trespass, and negligence claims, we must determine whether any of those claims present a nonjusticiable political question, as the district court believed they did. Because those claims do not present any specific question that is exclusively committed by law to the discretion of the legislative or executive branch, we hold that they are justiciable.

To begin with, it is useful to define the terms "justiciability" and "political question."  A question, issue, case or controversy is "justiciable" when it is constitutionally capable of being decided by a federal court.  Conversely, a question, etc., is "nonjusticiable" when it is not constitutionally capable of being judicially decided.  Under the separation of powers of the Constitution and the Supreme Court's cases, a question or subject matter that is committed by the Constitution, or by constitutional federal laws or regulations, exclusively to Congress or the president is not capable of being decided by a federal court.  Thus, whether a question is constitutionally  capable of being decided by a federal court depends ultimately on the separation of powers, other applicable constitutional provisions, and federal laws or regulations, not upon federal judges' capability, intellect, knowledge, expertise or training, nor upon the inherent difficulty, complexity, novelty or esotery of the matter to be resolved.

A "nonjusticiable" question is also known as a "political question," denoting that it has been constitutionally entrusted exclusively to either or both the executive or the legislative branch, which are called the "political" or "elected" branches. Correspondingly, the federal judiciary, whose members are appointed, is known as the "unelected" or "non-majoritarian" branch. Thus, in this context, "political" does not broadly relate to government, government policy, partisan or party politics, or the political system.  A case or question that is "political" only in the broad sense, i.e., that it has political implications or ramifications, is capable of being decided constitutionally by a federal court, so long as the question has not been committed by constitutional means exclusively to the elected or political branches.

The questions posed by this case, viz., whether defendants are liable to plaintiffs in damages under Mississippi's common law torts of nuisance, trespass or negligence, are justiciable because they plainly have not been committed by the Constitution or federal laws or regulations to Congress or the president.

There is no federal constitutional or statutory provision making such a commitment, and the defendants do not point to any provision that has such effect. The most that the defendants legitimately could argue is that in the future Congress may enact laws, or federal agencies may adopt regulations, so as to comprehensively govern greenhouse gas emissions and that such laws or regulations might preempt certain aspects of state common law tort claims. Until Congress, the president, or a federal agency so acts, however, the Mississippi common law tort rules questions posed by the present case are justiciable, not political, because there is no commitment of those issues exclusively to the political branches of the federal government by the Constitution itself or by federal statutes or regulations.

## A.

Initially, the Supreme Court formulated a narrow but clear political question or nonjusticiability theory. In Marbury v. Madison, Chief Justice Marshall stated: "By the Constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. . . . The subjects are political. They respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive. . . ." 5 U.S. (1 Cranch) 137, 165-66 (1803). "The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are by the constitution and laws, submitted to the executive, can never be made in this court." Id. at 170. In Marbury, Chief Justice Marshall contrasted political questions with instances in which individual rights are at stake; the latter, according to the Court, never could be political questions. If there was a claim

of an infringement of an individual right — in other words, if the plaintiff had standing — there was not a political question under the Marbury formulation.[8]

After Marbury, however, the Court blurred Chief Justice Marshall's sharp line between individual rights violations and questions committed to the political branches. The Court held some cases to be committed to the political branches for resolution, and therefore nonjusticiable, even though individuals claimed concrete injuries by specific constitutional violations.[9] The Court's citation to Marbury in those cases, without explaining why Chief Justice Marshall's theory was not strictly adhered to, caused confusion.

Eventually, in Baker v. Carr, 369 U.S. 186 (1962), in which the Court held justiciable an equal protection challenge to the malapportionment of a state legislature, Justice Brennan attempted to clarify why that alleged constitutional violation was justiciable whereas those alleged in other cases had been held to be nonjusticiable political questions. He confirmed that "it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship with the States, which gives rise to the 'political question,'" id. at 210; that the separation of powers is the source of the political question doctrine, id. at 210, 217; that the purpose of the doctrine is to prevent judicial interference with the exercise of powers committed to the political branches, see id. at 217; that the doctrine applies only when the federal court is required to decide a question that has "been committed by the Constitution to another branch of government," id. at 211; and that a court

---

[8] Erwin Chemerinsky, Federal Jurisdiction § 2.6, at 149 n.7 (5th ed. 2007) ("But notice the effect of Marbury's classification: Standing is just the obverse of political questions. If a litigant claims that an individual right has been invaded, the lawsuit by definition does not involve a political question.") (quoting Howard Fink & Mark Tushnet, Federal Jurisdiction: Policy and Practice 231 (2d ed. 1987)) (internal quotation marks omitted).

[9] See, e.g., Luther v. Borden, 48 U.S. (7 How.) 1 (1849) (declaring nonjusticiable a suit brought under the republican form of government clause even though the effect was to leave people in jail who contested the constitutionality of their conviction).

determining such a commitment must "analyze representative cases and . . . infer from them the analytical threads that make up the political question doctrine," id.

After a survey of the Court's cases, Justice Brennan identified the categories in which the political question doctrine had been discussed: foreign relations; dates of duration of hostilities; validity of enactments; status of Indian tribes; and republican form of government. From these cases, he derived Baker v. Carr's classic, oft-quoted "formulations" setting forth criteria to aid in determining whether a case would require a federal court to decide a question that is committed to a political branch and is therefore nonjusticiable. The Court stated:

> It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
>
> Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence. The doctrine of which we treat is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the

particular case, and the impossibility of resolution by any semantic cataloguing.

Id. at 217.

Plainly, the Baker v. Carr "formulations" were not written as stand-alone definitions of a "political question." They are open-textured, interpretive guides[10] to aid federal courts in deciding whether a question is entrusted by the Constitution or federal laws exclusively to a federal political branch for its decision. The Baker formulations are not self-sufficient definitions, but must be used together with the Constitution and federal laws to decide whether a particular constitutional or statutory provision commits a question solely to a political branch for decision. Consequently, if a party moving to dismiss under the political question doctrine is unable to identify a constitutional provision or federal law that arguably commits a material issue in the case exclusively to a political branch, the issue is clearly justiciable and the motion should be denied without applying the Baker formulations.

In deciding whether a case should be dismissed as a nonjusticiable political question, we must bear in mind the principles that govern the jurisdiction of federal courts: "It is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). "[F]ederal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred." New Orleans Public Service, Inc. v. Council of the City of New Orleans, 491 U.S. 350, 358 (1989). In Boumediene v. Bush, 128 S.Ct. 2229 (2008), the Supreme Court's reasoning reflected the principle that when a decision is committed exclusively to Congress, as the suspension of habeas corpus is, federal courts must consider

---

[10] See Lane v. Halliburton, 529 F.3d 548, 559 (5th Cir. 2008) ("Although the Baker formulations provide useful analytical guideposts in our analysis, '[w]hether an issue presents a nonjusticiable political question cannot be determined by a precise formula.'") (quoting Saldano v. O'Connell, 322 F.3d 365, 368 (5th Cir. 2003)).

the issue nonjusticiable; but when an issue is not so committed, federal courts are not free to abstain, and must exercise their jurisdiction if they have it. See id. at 2262 ("This Court may not impose a de facto suspension by abstaining from these controversies."). "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid; but we cannot avoid them." Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404 (1821). In sum, "[w]hen a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction." Willcox v. Consolidated Gas Co. of New York, 212 U.S. 19, 40 (1909).

The political question doctrine is a limited exception to the rule that "federal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred," New Orleans Public Service, 491 U.S. at 358. "Where the Constitution assigns a particular function wholly and indivisibly to another department, the federal judiciary does not intervene." Baker, 369 U.S. at 246 (Douglas, J., concurring). "The converse of this proposition is that a federal court must not abstain from the exercise of jurisdiction that has been conferred, unless it has been asked to conclusively resolve a question that is 'wholly and indivisibly' committed by the Constitution to a political branch of government." Zivotofsky v. Secretary of State, 571 F.3d 1227, 1235 (D.C. Cir. 2009) (Edwards, J., concurring). "Underlying these assertions is the undisputed constitutional principle that Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds." New Orleans Public Service, 491 U.S. at 359. Therefore, the federal courts are not free to invoke the political question doctrine to abstain from deciding politically charged cases like this one, but must exercise their jurisdiction as defined by Congress whenever a question is not exclusively committed to another branch of the federal government.

Unsurprisingly, federal cases in which subject matter jurisdiction and standing are properly asserted are rarely dismissed as nonjusticiable pursuant to the political question doctrine. Indeed, since Baker, the Supreme Court has only dismissed two cases as presenting nonjusticiable political questions. See Zivotofsky, 571 F.3d at 1236 (Edwards, J., concurring) (discussing Gilligan v. Morgan, 413 U.S. 1, 5 (1973) (declining a "broad call on judicial power to assume continuing regulatory jurisdiction over the activities of the Ohio National Guard" on the basis of an explicit constitutional textual commitment of that power to Congress and president), and Nixon v. United States, 506 U.S. 224 (1993) (finding a request to review Senate impeachment proceedings nonjusticiable in light of the explicit textual constitutional commitment of the impeachment power to the Senate)).

A federal court's dismissal of litigation between private citizens based on state common law, as presenting a nonjusticiable political question, has rarely, if at all,[11] been affirmed by a federal court of appeals. See 13C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3534.3, at 806 (3d ed. 2008) ("It seems unlikely that . . . one private citizen suing another . . . call[s] for resolution of a political question. Challenges to official action or inaction are the stuff of the separation of powers concerns that underlie political question reasoning.") (citing, as illustration, In re African-American Slave Descendants Litigation, 471 F.3d 754, 758 (7th Cir. 2006) (per Posner, J.) (holding that no political question was presented when the slave descendant plaintiffs carefully cast their diversity suits against

---

[11] The Ninth Circuit observed in 1992 that "we have found no Supreme Court or Court of Appeals decisions which have dismissed a suit brought against a private party on the basis of the political question doctrine." Koohi v. United States, 976 F.2d 1328, 1332 n.3 (1992).

corporations for reparations under state common law "as a quest for conventional legal relief")).[12]

Common-law tort claims are rarely thought to present nonjusticiable political questions. Three Circuits have stated, in the political question context, that "the common law of tort provides clear and well-settled rules on which the district court can easily rely." McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1364 (11th Cir. 2007); Alperin v. Vatican Bank, 410 F.3d 532, 554 (9th Cir. 2005); Linder v. Portocarrero, 963 F.2d 332, 337 (11th Cir. 1992); Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 49 (2d Cir. 1991). The Fifth Circuit has similarly observed that, "when faced with an 'ordinary tort suit,' the textual commitment factor actually weighs in favor of resolution by the judiciary." Lane v. Halliburton, 529 F.3d 548, 560 (5th Cir. 2008) (quoting Klinghoffer, 937 F.2d at 49). And the Tenth Circuit, in a case governed by state negligence law, stated that "the political question theory . . . do[es] not ordinarily prevent individual tort recoveries." McKay v. United States, 703 F.2d 464, 470 (1983). Claims for damages are also considerably less likely to present nonjusticiable political questions, compared with claims for injunctive relief. Indeed, the Fifth Circuit in Gordon v. Texas categorically stated that "[m]onetary damages . . . do not . . . constitute a form of relief that is not judicially manageable." 153 F.3d 190, 195 (5th Cir. 1998).[13]

---

[12] See also Lane v. Halliburton, 529 F.3d 548, 560-61 (5th Cir. 2008) (observing that "the first Baker formulation is primarily concerned with direct challenges to actions taken by a coordinate branch of the federal government," whereas "American courts have resolved such matters between private litigants since before the adoption of the Constitution").

[13] See also Koohi, 976 F.2d at 1332 ("A key element in our conclusion that the plaintiffs' action is justiciable is the fact that the plaintiffs seek only damages for their injuries. Damage actions are particularly judicially manageable."). Compare Gilligan v. Morgan, 413 U.S. 1, 11 (1973) (refusing to take cognizance of a suit seeking judicial supervision of the operation and training of the Ohio National Guard in the wake of the Kent State shootings), with id. at 5 (suggesting that the Court might allow a suit against the National Guard for damages), and Scheuer v. Rhodes, 416 U.S. 232, 247-49 (1974) (allowing such a suit).

Although federal courts may not decide an issue whose resolution is committed by the Constitution to the exclusive authority of a political branch of government, see Baker, 369 U.S. at 217; Gilligan, 413 U.S. at 6-7; Nixon, 506 U.S. at 228, a federal court may decide a case that merely implicates a matter within the authority of a political branch. For example, Congress alone has the authority to pass legislation, but the courts have authority to assess the constitutionality of a statute that has been properly challenged. "[T]he political question doctrine bars judicial review only when the precise matter to be decided has been constitutionally committed to the exclusive authority of a political branch of government." Zivotofsky, 571 F.3d at 1238 (Edwards, J., concurring). Compare Nixon, 506 U.S. at 229-36 (holding that a claim for review of Senate impeachment proceedings was nonjusticiable), with Powell v. McCormack, 395 U.S. 486, 519-22 (1969) (holding that a claim for review of the House's refusal to seat an elected representative did not present a nonjusticiable political question).

Further, federal courts may decide whether and to what extent a matter is reserved to the exclusive authority of a political branch. Baker, 369 U.S. at 211 ("Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution."); Powell, 395 U.S. at 521 ("[W]hether there is a 'textually demonstrable constitutional commitment of the issue to a coordinate political department' of government and what is the scope of such commitment are questions we must resolve . . . ."); Nixon, 506 U.S. at 238 ("[C]ourts possess power to review either legislative or executive action that transgresses identifiable textual limits.").

The federal courts must decide matters of statutory construction, constitutional interpretation, and, when applicable, state common law and statutes, and cannot avoid this responsibility when their decisions may have political implications. Japan Whaling Association v. American Cetacean Society, 478 U.S. 221, 230 (1986) ("[U]nder the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones."); INS v. Chadha, 462 U.S. 919, 943 ("Resolution of litigation challenging the constitutional authority of one of the three branches cannot be evaded by courts because the issues have political implications . . . .").

Following the framework laid out in Nixon v. United States, we must begin by "interpret[ing] the [constitutional] text in question and determin[ing] whether and to what extent the issue is textually committed" to a political branch. 506 U.S. 224, 228 (1993); see also Powell v. McCormack, 395 U.S. 486, 519 (1969). Thus, we need to know both the "issue" presented by the case at hand and the federal constitutional or statutory "text" asserted to have committed that issue exclusively to a political branch. "Only then can we decide whether that issue has been committed by the Constitution solely to the political branches or whether it is a proper matter for the judiciary to resolve." Zivotofsky, 571 F.3d at1230 (majority opinion) (citing Nixon, 506 U.S. at 228).

In this case the only "issues" are those inherent in the adjudication of plaintiffs' Mississippi common law tort claims for damages. There is no federal constitutional or statutory provision committing any of those issues exclusively to a federal political branch. The district court's adjudication of this case is well within the authority of the federal judiciary. Under the Constitution and federal laws, one of the judiciary's characteristic roles is to adjudicate diversity cases based on state law.

Because the defendants have failed to articulate how any material issue is exclusively committed by the Constitution or federal laws to the federal political branches, the application of the Baker formulations is not necessary or properly useful in this case. Even if applied, the formulations do not make the defendants' argument for nonjusticiability any more persuasive. The defendants have not shown any exclusive textual commitment of the issues in this case to a federal political branch. Nor have they shown the absence of judicially discoverable or manageable standards with which to decide this case. Mississippi and other states' common law tort rules provide long-established standards for adjudicating the nuisance, trespass and negligence claims at issue. The policy determinations underlying those common law tort rules present no need for nonjudicial policy determinations to adjudicate this case.[14] Nor would the district court's adjudication of this case express or imply any lack of the respect due coordinate branches of the federal government. Even when a court finds that Congress has passed an unconstitutional law, there is no "lack of respect" for Congress's judgment. See United States v. Munoz-Flores, 495 U.S. 385, 390 (1990). There is no unusual need for unquestioning adherence to a federal political branch decision already made, and no potentiality of embarrassment from multifarious pronouncements by various federal departments on one question. For example, this is not a case in which, for those reasons, federal courts must completely defer to the executive's recognition of or refusal to recognize a foreign government.

B.

---

[14] See, e.g., George W. Pugh, The Federal Declaratory Remedy: Justiciability, Jurisdiction and Related Problems, 6 Vand. L. Rev. 79, 86 (1952) ("In any judicial adjudication, the court is furnished by precedent or legislation with at least the broad outlines of policy. It is quite true that the judiciary must ascertain the broad applicable policy, but it does not itself make that policy in the specific case. It finds it.").

The defendants' reliance upon the district courts' decisions in California v. General Motors Corp., 2007 WL 2726871 (N.D. Cal. 2007), and Connecticut v. American Electric Power Co., 406 F. Supp. 2d 265 (S.D.N.Y. 2005)[15] is misplaced. Those decisions are legally flawed and clearly distinguishable from the present case.

First, the decisions in both American Electric and General Motors are based on a serious error of law. In each case, the district court incorrectly read the Supreme Court in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc. as holding that federal courts in air pollution cases must balance social and economic interests like a legislative body. They mistook Chevron to state that:

> to resolve typical air pollution cases, courts must strike a balance "between interests seeking strict schemes to reduce pollution rapidly to eliminate its social costs and interests advancing the economic concern that strict schemes [will] retard industrial development with attendant social costs."

General Motors, 2007 WL 2726871 at *7 (quoting American Electric, 406 F. Supp. 2d at 272 (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 847 (1984))). But the Court did not so state. Instead, the Chevron Court, in the language quoted, was simply referring to and describing the balancing of interests in Congress's legislative process. Chevron does not require federal courts to imitate the legislative process.[16]

---

[15] The Second Circuit Court of Appeals recently reversed the district court's decision in American Electric, holding that the case was justiciable. No. 05-5104-cv, 05-5119-cv (September 21, 2009). Although we arrived at our own decision independently, the Second Circuit's reasoning is fully consistent with ours, particularly in its careful analysis of whether the case requires the court to address any specific issue that is constitutionally committed to another branch of government. The reversal of American Electric casts additional doubt on the persuasiveness of General Motors, whose reasoning drew heavily from that of the district court in American Electric.

[16] As the Court's cases make clear, the historic and traditional function of the federal judiciary is not legislation, but adjudication of controversies between adversaries based on

29

From their erroneous premise, the two district courts reasoned in a circle: "In this case, balancing those interests, together with the other interests involved, is impossible without an 'initial policy determination' first having been made by the elected branches to which our system commits such policy decisions, viz., Congress and the President." American Electric, 406 F. Supp. 2d at 272; see also General Motors, 2007 WL 2726871 at *7 (using almost identical language). Because they took an erroneous reading of Chevron as their premise, their conclusion as to the nature of the questions presented in the cases before them was erroneous also. Neither Chevron nor any other Supreme Court decision requires federal courts to imitate the functions of legislative or regulatory bodies in "typical air pollution cases."[17]

---

rules furnished by precedent or legislated law. Neither judges nor Congress can assign the courts a legislative or non-judicial function. Justice Scalia, writing for the plurality in Vieth v. Jubelirer, explained the difference between the branches' traditional roles as follows:

> "The judicial Power" created by Article III, § 1, of the Constitution is not whatever judges choose to do, see Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 487 (1982); cf. Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 332-333 (1999), or even whatever Congress chooses to assign them, see Lujan v. Defenders of Wildlife, 504 U.S. 555, 576-577 (1992); Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 110-114 (1948). It is the power to act in the manner traditional for English and American courts. One of the most obvious limitations imposed by that requirement is that judicial action must be governed by standard, by rule. Laws promulgated by the Legislative Branch can be inconsistent, illogical, and ad hoc; law pronounced by the courts must be principled, rational, and based upon reasoned distinctions.

541 U.S. 267, 278 (2004) (plurality opinion) (parallel citations omitted).

[17] Indeed, under the district courts' erroneous premise and reasoning, all "typical air pollution cases" would pose nonjusticiable political questions and would have to be dismissed at the outset.

Even if a particular case involves a claim for injunctive or other equitable relief that the court finds to be impracticable, a court sitting in equity has the discretion to limit or mold relief for reasons of practicality. There is no need or authority to invoke the political question doctrine for such reasons. For instance, in Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982), the plaintiffs sought an injunction ordering the Navy to cease violation of the Federal Water Pollution Control Act through its training operations near Puerto Rico. See id. at 306-07. The Court noted that "a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law," id. at 313, and remanded the case for consideration

Second, the American Electric and General Motors courts' application of the political question doctrine appears to be at odds with the Supreme Court's and Congress's treatment of the analogous issue of transboundary water quality control.[18]  In Ohio v. Wyandotte Chemicals Corp., 401 U.S. 493 (1971), the State of Ohio sought to enjoin chemical manufacturers in other states and Canada from discharging mercury into the tributaries of Lake Erie as a public nuisance. While ultimately declining to hear the suit as an original jurisdiction action, the Court explicitly distinguished cases in which the political question defense was sustained[19]; recognized that it had often adjudicated controversies between States and between a State and citizens of another State seeking to abate a nuisance that exists in one State yet produces noxious consequences in

---

of whether the federal courts in their "equitable discretion" should grant an injunction, see id. at 320.  Despite the case's obvious political implications, the Court analyzed it in terms of equitable discretion, not the political question doctrine. See also Kimberly Breedon, Remedial Problems at the Intersection of the Political Question Doctrine, the Standing Doctrine, and the Doctrine of Equitable Discretion, 34 Ohio N. U. L. Rev. 523, 552-57 (2008) (pointing out that many cases that might be thought to implicate the Baker formulation requiring "judicially manageable standards" can best be addressed through the exercise of equitable discretion).

[18] See Philip Weinberg, "Political Questions": An Invasive Species Infecting The Courts, 19 Duke Envtl. L. & Pol'y F. 155,162-63 (2008).  The General Motors court attempted to distinguish the transboundary nuisance cases, 2007 WL 2726871 at *15, but its reasoning on this point is unpersuasive.  The court did not explain why it believed that those cases were somehow more justiciable rather than less so because they involved injunctive relief rather than damages.  As discussed above, the Fifth Circuit in Gordon v. Texas found monetary damages to be more judicially manageable than injunctions. 153 F.3d 190, 195 (5th Cir. 1998). The General Motors court also failed to explain how the "national and international policy issues" implicated by global warming, or the impossibility of attributing pollution to specific external sources in the global warming context, would render the political question doctrine applicable.  See 2007 WL 2726871 at *15.  Although the worldwide effects of greenhouse gas emissions may, for instance, make it difficult for the plaintiffs to show proximate causation, it does not follow that the issue has been committed exclusively to the political branches for decision.

[19] Id. at 496 (distinguishing Mississippi v. Johnson, 71 U.S. (4 Wall.) 475 (1867) (suit to enjoin the president from executing the Reconstruction Acts), and Georgia v. Stanton, 73 U.S. (6 Wall.) 50 (1868) (same, but against the Secretary of War and other officials)).

another[20]; and ruled that "precedent leads almost ineluctably to the conclusion that we are empowered to resolve this dispute."[21]

Moreover, "[t]he courts have long and consistently rejected assertions that the enactment of regulatory statutes like the Clean Air Act and Clean Water Act preempt states from public nuisance actions." Weinberg, supra note 10, at 163 n.72. In City of Milwaukee v. Illinois, 451 U.S. 304 (1981), the Court held that the federal common law of nuisance was preempted by the 1972 amendments to the Clean Water Act, which comprehensively occupied the field. Id. at 327-32. In doing so, however, the Court noted that the CWA preserved nuisance suits under state common law, see id. at 327-29, and stated further that:

> [T]he appropriate analysis in determining if federal statutory law governs a question previously the subject of federal common law is not the same as that employed in deciding if federal law pre-empts state law. In considering the latter question "'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). While we have not hesitated to find pre-emption of state law, whether express or implied, when Congress has so indicated, see Ray v. Atlantic Richfield Co., 435 U.S. 151, 157 (1978), or when enforcement of state regulations would impair "federal superintendence of the field," Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142 (1963), our analysis has included "due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy." San Diego Building Trades Council v. Garmon, 359 U.S. 236, 243 (1959).

---

[20] Id. (citing Missouri v. Illinois, 200 U.S. 496 (1906), Georgia v. Tennessee Copper Co., 206 U.S. 230 (1907), New York v. New Jersey, 256 U.S. 296 (1921), and New Jersey v. New York City, 283 U.S. 473 (1931)).

[21] Id.

Id. at 316 (parallel citations omitted). The Clean Air Act and other federal legislation on air quality are much less comprehensive than the CWA, as amended. The defendants here do not contend, and the district courts in American Electric and General Motors did not hold, that any act of Congress has preempted state law with respect to global warming. Even if Congress does eventually enact a comprehensive federal law concerning greenhouse gas emissions, it might very well preserve state common law remedies, as the CWA did. The defendants' briefs in this case fall far short of showing the "clear and manifest purpose" of Congress that the Supreme Court in Milwaukee v. Illinois stated was necessary to overcome the "assumption that the historic police powers of the States were not to be superseded by the Federal Act[s]," id. Given the clear inapplicability of federal preemption in this case, we will not employ the political question doctrine in a way that would amount to a de facto preemption of state law.

Third, American Electric and General Motors were not diversity suits under state common law between private parties for damages only (i.e., "quest[s] for conventional legal relief," In re African American Slave Descendants Litigation, 471 F.3d 754, 758 (7th Cir. 2006)). Rather, they were actions brought by state attorneys general for their state governments based partly on federal common law. Unlike the present plaintiffs' "damages only" state law tort suit, the American Electric suit asked for an injunction explicitly imposing future emissions standards and allowances, and the General Motors suit pressed for a declaratory judgment having future effects in addition to damages. Despite these distinguishing characteristics, American Electric and General Motors did not genuinely present nonjusticiable political questions, because neither court could demonstrate (rather than assume as a false premise) that a specific issue that had been exclusively committed to a political branch by a federal constitutional or statutory provision.

33

We need not decide whether the district courts in American Electric and General Motors properly decided the federal common law questions with which they were presented. It suffices to recognize that the initial flaw or false premise in those decisions is essentially the same as that which undermines the defendants' argument in this case. Similarly to those district courts, the defendants here have failed to follow the method laid out by the Supreme Court in Nixon v. United States, 506 U.S. 224, 228 (1993), which requires, first, carefully identifying the issues that the plaintiffs' claims pose for decision, and, second, "interpret[ing] the [constitutional] text in question and determin[ing] whether and to what extent the issue[s are] textually committed" to a political branch. Id. Like the district courts in American Electric and General Motors, the defendants begin with an assumption they cannot support, viz., that the adjudication of plaintiffs' claims will require the district court to fix and impose future emission standards upon defendants and all other emitters. Then, again in a fashion similar to those district courts, the defendants proclaim that it would be "impossible" for a court to perform such an obviously legislative or regulatory task so that the case must present a nonjusticiable political question. The defendants have failed to show how any of the issues inherent in the plaintiffs' nuisance, trespass, and negligence claims have been committed by the Constitution or federal laws "wholly and indivisibly"[22] to a federal political branch.

## CONCLUSION

The plaintiffs have pleaded sufficient facts to demonstrate standing for their public and private nuisance, trespass, and negligence claims. We decline to find standing for the unjust enrichment, civil conspiracy, and fraudulent

---

[22] Baker v. Carr, 369 U.S. 186, 246 (1962).

misrepresentation claims and DISMISS these claims.  We find that the plaintiffs' remaining claims are justiciable and do not present a political question.  We do not hazard, at this early procedural stage, an Erie guess into whether these claims actually state all the elements of a claim under Mississippi tort law, e.g., whether the alleged chain of causation  satisfies the proximate cause requirement under Mississippi state common law; we leave this analysis to the district court in the first instance.  Thus, for the foregoing reasons, we REVERSE the judgment of the district court and REMAND the case to the district court for further proceedings consistent with this opinion.

DAVIS, Specially Concurring:

I agree with the panel opinion that the plaintiffs in this case have standing to bring their claims. In addition, because there is no clear authority dictating that we do not have jurisdiction over this case under the political question doctrine, I agree as well with the result the panel reaches on that point.

The defendants argued an alternative basis for dismissal to the district court – that the plaintiffs failed to state a claim under common law. Specifically, the defendants argued to the district court that the plaintiffs failed to allege facts that could establish that the defendant's actions were a proximate cause of the plaintiffs' alleged injuries. If it were up to me, I would affirm the district court on this alternative ground.

I recognize however that the panel has discretion whether to decide this case on a ground other than one relied on by the district court and I defer to the panel's discretion not to address that argument. With this reservation, I concur.